## 10473

### STATE v. BUTLER.

#### (103 S. E. 762.)

1. RAPE—EVIDENCE HELD TO SHOW INTENT TO RAPE.—Evidence *held* to show that the assault was made with the intent to commit rape.

2. CRIMINAL LAW—EVIDENCE THAT PROSECUTRIX DID NOT IDENTIFY OTHER PRISONER PRESENTED FOR IDENTIFICATION IN DEFENDANT'S ABSENCE NOT PREJUDICIAL.—In prosecution for assault with intent to ravish, in which defendant claimed an *alibi,* the admission of evidence of prosecutrix that another prisoner in defendant's absence was presented to her for identification, and that she did not identify him as the man who made the assault, *held* not prejudicial to defendant.

3. RAPE—TESTIMONY THAT PROSECUTRIX DID NOT IDENTIFY ANOTHER PRISONER AS THE GUILTY MAN HELD ADMISSIBLE.—In prosecution for assault with intent to rape, in which defendant claimed an *alibi,* testimony of prosecutrix that a prisoner other than the defendant was presented to her for identification in defendant's absence, and that she stated that such prisoner was not the man who assaulted her, *held* admissible.

4. CRIMINAL LAW—STATEMENTS OF PROSECUTRIX ON RETURN HOME AFTER ASSAULT RES GESTAE.—In prosecution for assault with intent to rape, testimony as to statements of prosecutrix to the members of her family immediately on her return home after the assault was admissible as part of the *res gestae.*

5. RAPE—EVIDENCE AS TO PROSECUTRIX'S IDENTIFICATION OF DEFENDANT HELD ADMISSIBLE.—In prosecution for assault, testimony as to identification of defendant after a number of other prisoners had been called before her for identification one by one *held* admissible; such method of identification being fair.

29—S. C. 114

6. RAPE—EVIDENCE THAT MAN COULD HAVE CONCEALED HIMSELF BY ROAD, IN ABSENCE OF EVIDENCE AS TO CONCEALMENT, NOT ERROR.—In prosecution for assault with intent to rape, admission of testimony that a man could have concealed himself close to the road *held* not error, though there was no testimony as to whether defendant was concealed before accosting prosecutrix.

7. CRIMINAL LAW—INSTRUCTION AS TO PROOF OF ALIBI NOT ERROR IN VIEW OF FAILURE TO REQUEST OTHER INSTRUCTION.—An exception to an instruction that defendant must establish his plea of *alibi* "by the greater weight of the evidence" cannot be sustained, where defendant in accordance with his contention as to the law made no request for an instruction that evidence evenly balanced was sufficient, and giving him the benefit of reasonable doubt, the jury would have to acquit.

8. CRIMINAL LAW—INSTRUCTION AS TO PROOF OF ALIBI HELD NOT ERROR IN VIEW OF OTHER INSTRUCTION.—The giving of an instruction requiring defendant to establish his plea of *alibi* by the greater weight of the evidence *held* not error, in view of other instruction to acquit defendant if jury had a reasonable doubt as to whether or not defendant had established his *alibi.*.

Before GARY, J., Spartanburg, October term, 1919. Affirmed.

Grover Butler indicted for assault with intent to ravish, and, upon conviction, appeals.

The following are the exceptions referred to in opinion:

Exception 1.—In that there was no testimony whatever that the defendant made an assault with intent to commit rape.

Exception 2.—In that his Honor erred in overruling the objection of the defendant to the following questions and answers: "Was this man, referring to Kelly Thompson, presented to you for identification?" and permitting the answer, "Yes, sir"—the defendant contending that this was incompetent for the reason the said witness admitted that whatever took place at this alleged identification of Kelly Thompson was in the absence and beyond the hearing of the defendant, and that the defendant for that reason was not responsible for nor bound by the same; and in further overruling defendant's objection based on the same ground to the

following question by the solicitor and answers by the witness, to wit: "Q. Was this man presented to you first? A. Yes, sir. Q. Did you identify him as not the man? A. Yes, sir." This testimony the defendant claims disclosed to the Court and jury what the said witness and prosecutrix testified took place in the absence and beyond the hearing of the defendant; said testimony being highly prejudicial to the defendant, in that it undertook to show that the prosecutrix had stated in the absence of the defendant that a certain other man had been presented to her, and that she had stated that he was not the man; thereby attempting, by incompetent testimony, to bolster up and strengthen her alleged statement that the defendant did assault her.

Exception 3.—That his Honor erred in overruling the objection of the defendant to the following questions and answers: "Q. Did you have some one to point out this spot in the road where this alleged assault happened? A. Yes, sir. Q. Your daughter reported this to you, when? A. In a few minutes after it happened, I suppose; she had not been gone up but a few minutes, when she came back down the road. Q. Did you go straight to the scene? A. Right straight. Q. And she pointed it out to you? A. As nigh as she could. Q. What did she say? A. She came down the road crying, and told me that a black fellow had insulted her, and we went right back. I could see the ground kind of scraped up"—it being respectfully submitted that the same was incompetent, hearsay, and prejudicial; and that the force of the same was to attempt to corroborate statements of the prosecutrix, and to bolster up and strengthen her statements.

Exception 4.—That his Honor erred in admitting over objection of defendant to the following questions and answers: "Q. What description did she give? A. Said he was kind of a yellow fellow. Q. What other description did she give, if any? A. Said he was a mulatto, and had on

overalls—did not say whether they were old or new—said he was dressed in an overall suit. Q. What did she say as to his size? A. Said he would weigh about 140 to 135, something like that—I forget exactly"—it being respectfully submitted that the same was incompetent, hearsay, and prejudicial; and that the force of the same was to attempt to bolster up and strengthen the statements of the prosecutrix.

Exception 5.—That his Honor erred in admitting over objection of the defendant the following questions and answers by a sister of the prosecutrix: "Q. What did she say? What did she say about it? A. She told us she had been attacked by a negro, and told all she said. Q. What did she tell he said? A. She said he asked her for change —could she change $5—and she told him she did not have any money; if he would go down to the house, maybe my father could; and that he then said he would give her $100 for her person, and that she asked him what did he say, and that he ran toward her and said, 'I want you.' She said then he grabbed her around the waist. Q. Did she point out the place to you? A. Yes, sir"—it being respectfully submitted that the same was incompetent, hearsay, prejudicial, the force of which was to bolster up and strengthen the statements of the prosecutrix.

Exception 6.—That his Honor erred in admitting, over objection of defendant, witness, Bryant, to testify in regard to the identification of the defendant by the prosecutrix in the county jail, while he was under arrest, as follows: "Q. How was it done? A. He was put in a cell with nine other negroes, and Miss ——— was sent for. She got there somewhere in the neighborhood of 6 o'clock Sunday afternoon. The sheriff told her, 'We have ten negroes up here in the cell and we want you to come up and look at them, and, if you see the negro that assaulted you, nod your head; and if you do not, don't open your mouth.' We taken her

to look over the negroes, some several of us around.   After a while she nodded her head.   He says, 'Do you see him?'   Then he says, 'Negro, you come up here.'   He says, 'Is that the man?'   She shook her head.   He says, 'Take him back.'   Then he says, 'Negro, you come up here.'   She shook her head.   He says, 'Stand back.'   Then he said, 'Negro, you come up here.'   She bowed her head.   That was Grover Butler"—it being respectfully submitted that the same was cumulative, incompetent, and prejudicial.

Exception 7.—That his Honor erred in admitting over objection of the witness, J. F. Floyd, to answer the following: "Q. A month ago, the 15th of September, at the time this is said to have happened, would you regard it possible for a man to conceal himself close to that road? A. I would"—it being respectfully submitted that the same was incompetent, irrelevant, and prejudicial to the defendant, in that no one had testified that the defendant had concealed himself, or attempted to conceal himself, in said woods.

Exception 8.—That his Honor erred in admitting over objection of the defendant, J. F. Floyd, to answer the following: "Q. Were you present on the Sunday at the county jail when this young lady made this identification? A. I was present and saw this young lady when she went through the identification.   She was carried upstairs before she went to the cell.   She was told to go to the cell and see if she could identify the man, and, if she could, to nod her head and step back.   She stepped back, and said he was there.   The sheriff had No. 1 step up, and she made no sign, and No. 2 and No. 3 the same way, until he came to the fourth one, which she identified as Grover Butler, just as clear as a bell"—the same being cumulative, and highly prejudicial to the defendant, the force of which was merely to bolster up the testimony of the prosecutrix.

Exception 9.—That his Honor erred in admitting over objection of the defendant, the witness, W. J. White, to

answer the following questions: "Q. What identification did you have there? A. I put him in a cell to himself, dressed just like he was when I got him, and sent for Mayor Floyd and Chief Hill. We decided to put him in his overalls and the cap, just like he was dressed before. We got the cap from his grandmother, and put him in the cell with nine other negroes, ranging different sizes, colors, and ages. I sent for Miss ———— at her sister's; had two blowouts on the way. We got her here about 6 o'clock. Her sister was with her, and she came back with her. I told Miss ———— I had a negro upstairs in a cell with several others I wanted her to look at, and if she should recognize that man, I wanted her to nod her head. Q. Did you help her in any way, or make any suggestion that would enable her to identify him? A. I called the officers upstairs and brought her up myself. I then brought all nine in one cell. She looked over the crowd, and I saw she wanted to say something. I says, 'Is he in there?' She says, 'Yes, sir.' I says, 'Stand up.' I says, 'You come up here, negro.' I said to her, 'Is that him?' I says, 'Stand back.' I went through just that way until I called the fourth man up, which was his turn. When I called him up, she said, 'That is him,' without any hesitation whatever, and regardless of the fact he had shaved his mustache off"—the error being that the evidence was cumulative; that he was under the duress of being in prison; that he was required to change his clothing and his appearance, and the force of which was to likewise bolster up and give strength to the testimony of the prosecutrix.

Exception 10.—In that his Honor erred in charging the jury that the defendant must establish his plea of *alibi* "by the greater weight of the evidence"—the error being that his Honor limited the jury in his instruction to consider whether or not the defendant, by the greater weight of the evidence, had established by the greater weight of the evidence his plea of *alibi;* whereas, his Honor should have

instructed the jury that if the evidence was evenly balanced, that was sufficient, and the jury, giving the defendant the benefit of the reasonable doubt, would have to acquit him.

*Messrs. L. C. Southard* and *C. P. Sims,* for appellant. *Mr. Southard* cites: *Intent of defendant can be proven by expressions or conduct, or both, in the light of the circumstances:* 84 S. C. 47. *Testimony of father and sister of prosecutrix reciting statements made by the prosecutrix some time after the alleged assault is admissible as part of res gestae:* 56 S. C. 369; 68 S. C. 310; 21 A. & E. Enc. Law 99-100-101.

*Mr. I. C. Blackwood, Solicitor,* and *Mr. A. E. Hill,* for respondent. Oral argument.

July 26, 1920.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The defendant was tried at the October, 1919, term of the Court of General Sessions for Spartanburg county, upon the charge of assault with intent to ravish. The defendant denied the facts narrated in the testimony of the prosecutrix, and set up the defense that he was not present at the time of the alleged assault—in other words, an *alibi.*

The jury rendered a verdict of guilty, and the defendant was sentenced to be electrocuted on the 5th day of December, 1919. He appealed upon numerous exceptions, which will be reported. The prosecutrix thus testified:

"Q. Now, just state what happened to you on Monday morning, the 15th day of last September. A. I was on my way to my work in Spartanburg. Q. What road did you have to travel to come to Spartanburg? A. Highland avenue. Q. Is your house outside the city limits? A. Just in. Q. In coming from your residence to work, through what portion of the town do you travel? A. Southwestern. Q.

Then you come through the colored district? A. Yes, sir. Q. As you come away from your home the first 200 or 300 yards, what is there along the road? A. Just a field; not anything. Q. How does your house sit with respect to that piece of woods you had to pass coming to the city—down the hill, is it not; practically out of sight, except the top, the upper story, from that point? A. Yes, sir. Q. About what time of day was it, when you came along near where this piece of woods is, that morning? A. About 8 o'clock. Q. When you approached these woods whom did you see, if anybody? A. I didn't see any one until this Grover approached me. Q. How close were you to the woods? A. I was 8 or 10 feet from the edge of the woods. Q. Had you seen any one up to that time? A. No, sir. Q. How did he approach you—just speak so this gentleman over here can hear you? A. He said, 'Lady, can you change $5?' Asked me if I could change $5. I told him I did not have any change—perhaps, if he would go down to the house, my father could change it. He said, 'I will give you $100 for your person,' and w.th that he ran out and grabbed me about the waist. Q. What did he say as he grabbed you? A. He said, 'I want you.' Q What part of your body did he grab you? A. He grabbed me around the waist, with his left hand. Q. What, if anything, did he have in his right hand? A. He tried to get his right over my mouth. Q. How long did he engage you in the struggle before you got loose? A. I could not say— just a short while. Q. How did you get loose? A. I jerked loose. I had on this patent leather belt, and his hand slipped, and when his hand slipped I jumped to my feet and screamed, and when I screamed he ran down through the woods. Q. You say you jumped to your feet? A. I fell to the ground when he grabbed me, and I screamed as I was coming up, and he ran down through the woods. Q. What portion of your wearing apparel did you lose? A I lost a comb I was wearing in

my hair. Q. Did you lose any other part of your wearing apparel? A. Lost no other part of my wearing apparel. Q. Did you know at that time that you had lost your comb? A. I did not. Q. What became of him? A. He ran down through the woods. Q. That piece of woods would be to your right coming towards the city? A. Yes, sir. Q. What is on the left? A. It is an open field on the left. Q. What house, if any, is near there? A. Not any. Q. Tolerably near? A. There is a negro house. Q. Is, or not, that house this way coming towards Spartanburg? A. This way; yes, sir. Q. Did you see any one around that house at that time? A. No, sir; I did not. Q. Did you see any one in hearing or sight there when he came to where you were? A. No, sir. Q. When he ran what did you do? A. I was so stunned I just stood there, and then I started down to my home and told my father. Q. When was the next time you came to the place, and whom did you come with where this happened? A. I came back later. I came with Sheriff White and Mr. Lancaster and my father, and two other gentlemen; I don't remember the names; two other officers, I think. Q. Did you point out to them the place where he grabbed you in the road? A. Yes, sir. Q. Where the struggle took place? A. Yes, sir. Q. And did you or not show them where he left through the woods? A. Yes, sir. Q. Did you or not describe his personal appearance to them? A. Yes, sir. Q. After that time, then, do you know who did that now? Do you know the man that grabbed you? A. Yes, sir. Q. Who is he? A. That Grover— Q. Is this he over here? A. Yes, sir. Q. You are confident that is the man. A. Yes, sir. Q. When was the first time you saw him afterwards? A. At the county jail. Q. Did you identify him there? A. Yes, sir. Q. Who were present? A. My father and my sister, Sheriff White, and Mr. Floyd, and Chief Hill, and Mr. Lancaster, and Mr. Haddon. Q. Did anybody aid you in making this identification? You

made it unaided and alone? A. Yes, sir. Q. Positively? A. Yes, sir. Q. Before you identified him, did they present to you some other person? A. Yes, sir. Q. (Where is that fellow? What is your name? A. Kelly Thompson.) Was this man presented to you for identification? A. Yes, sir. (Objection.)

"The Court: It is a circumstance testing the accuracy of her identification—it is just a circumstance for the consideration of the jury; they may give it any weight they want to. I think it is proper for it to come out.

"Q. (By C. P. Sims, Esq.) : I would like to ask her if this defendant was present when this alleged transaction, of which she is now testifying, took place. If he was not present, we would ask if, under those circumstances, the testimony is competent.

"The Court: I think it is proper for it to come out.

"Q. Was the other man present when this man was presented for your identification? A. No, sir. (Objection on the ground the other man was not present.) Q. What was the appearance of Grover Butler that morning, how was he dressed? A. The best I can remember he had on overalls—an overall suit—he had on nice looking tan shoes, and, I think, he had on a cap. He appeared very neatly— his appearance was very neat. Q. What was his appearance as for teeth and mustache? A. Had a Charlie Chaplin mustache, and beautiful white teeth. Q. At the time you did identify him, how many negroes were in the cell with him? A. Nine. Q. When you were first admitted in the jail room, was he among the nine others? A. Yes, sir. Q. What question, if any, did they ask you at that time? What question were you asked by the sheriff or anybody else? A. He told me he was going to carry me up to the cell. He said he would bring one out at a time, and for me to nod my head and identify him, if it was the one. Q. Were you able to tell whether he was the one among all those in there?

A. Yes, sir. Q. That point out there is in Spartanburg county and in the city limits? A. Yes, sir. Q. In passing through that place there coming to the city, coming to Spartanburg, what sort of district is that, white or colored? A. Mostly colored. Q. Is there, or not, a colored store near this point? A. Yes, sir. Q. Have you, or not, been passing back and forth this way by that colored store and those colored houses as you came to and from your work? A. Yes, sir. Q. At what hours? A. About 8 o'clock in the morning, and return 5:30 or 6. Q. Usually with some one or unaccompanied? A. Usually unaccompanied. Q. Had you any occasion to observe crowds of colored men and colored folks when you would pass through there? A. Yes, sir. I did not observe them particularly; just noticed them congregated there at times when I would pass through. Q. Are there any white families near there? A. My father runs a plantation there. We are the only white family right close around there. It is some distance to the first white house, and some distance this way to the nearest—to the first house in town. Q. It is kind of lonely place down on the creek there, your home? A. Yes, sir. Q. Did you receive any injuries as to your clothing when you fell in that scuffle? A. My skirt had dust on it. Q. Any other marks or injuries to amount to anything? A. No, sir. Q. Was that condition brought about by falling? Did you exhibit that condition to any of the officers? A. My sister noticed it."

The exceptions now will be considered.

First exception. It is only necessary to refer to the testimony which we have reproduced, to show that this exception cannot be sustained.

Second exception. Even if this testimony was irrelevant and incompetent, it cannot be successfully contended that it was prejudicial to the rights of the defendant.

This Court, however, approves the ruling of his Honor, the presiding Judge, hereinbefore stated.

Third, fourth, and fifth exceptions. What the prosecutrix stated to the members of her family immediately upon her return home after the assault was admissible in evidence on the ground that it was a part of the *res gestae.*

Sixth, eighth, and ninth exceptions. It was necessary for the prosecutrix, in the interest of law and order, to identify, if within her power, the one who made the assault upon her; and there was no unfairness whatever in the methods of identification which were pursued.

Seventh exception. It does not appear from the testimony whether the defendant was concealed or not before accosting the prosecutrix.

Tenth exception. There are two reasons why this exception cannot be sustained. In the first place, no request was presented embodying the proposition of law for which the appellant's attorney now contends; and, in the second place, his Honor, the presiding Judge, thus charged the jury: "If, after a review of the whole testimony, the testimony as to the *alibi,* and the testimony as to what his intentions were, if in view of the entire testimony, you have a reasonable doubt as to whether he is guilty, it is your duty to acquit him. If you have a reasonable doubt as to whether or not he has established his *alibi,* it is your duty to acquit him."

It is the judgment of this Court that the judgment of the Circuit Court be affirmed, and that the case be remanded to the Circuit Court, for the purpose of having another day assigned, carrying into execution the sentence imposed by the Court.