### THE STATE v. PETIT

### (142 S. E., 725)

1. CRIMINAL LAW—EVIDENCE WHICH ASSISTS IN GETTING AT TRUTH OF ISSUE IS "RELEVANT" AND ADMISSIBLE, UNLESS INCOMPETENT; "COMPETENT."—Any evidence that assists in getting at the truth of the issue is relevant and admissible, unless because of some legal rule it is incompetent; "competent" evidence being always admissible, since it is evidence which the very nature of the thing to be proven requires, whereas "relevant" evidence is that which directly touches on the issue which the parties have made by their pleadings.

2. CRIMINAL LAW—ADMISSION OF TESTIMONY IS LARGELY WITHIN TRIAL COURT'S DISCRETION, AND ERROR IN ADMITTING OR EXCLUDING EVIDENCE DOES NOT WARRANT REVERSAL, UNLESS PREJUDICIAL.—Admission of testimony in a criminal case is largely within the discretion of the trial Judge, and is not ground for reversal, unless unsuccessful party can show that the admitted testimony was wrongfully accepted, or rejected testimony improperly refused, and that error was prejudicial.

3. HOMICIDE—ADMISSION OF TESTIMONY CONCERNING INTIMATE RELATIONS BETWEEN FAMILIES AND CALLING IN OF DEFENDANT'S DAUGHTER WHEN DEFENDANT QUARRELED WITH HIS WIFE HELD NOT ERROR IN PROSECUTION FOR MURDER OF NEIGHBOR.—In prosecution of defendant for murder of neighbor who came on defendant's premises at night, on overhearing quarrel between defendant and his wife, admission of testimony concerning intimate relations between the families, and that deceased's mother called defendant's child to her home whenever defendant and his wife got "in a fuss," *held* not error, especially where defendant admitted intimacy between families and quarreling with his wife, evidence being competent and relevant.

4. HOMICIDE—FORMER FRIENDLY OR STRAINED RELATIONSHIPS OF PARTIES, INCLUDING CLOSE RELATIVES, MAY OFTEN BE SHOWN.—Former friendly or strained relationships of parties to lawsuits, including that of the close relatives of the parties, are very often admissible in evidence.

5. HOMICIDE—REFUSAL TO PERMIT TESTIMONY AS TO WHERE DEFENDANT AND DECEASED GOT LIQUOR PRECEDING HOMICIDE HELD NOT

NOTE: On opinion evidence by nonexpert as to intoxication, see 11 L. R. A. (N. S.), 639; 11 R. C. L., 608; 2 R. C. L. Supp., 1283; 6 R. C. L. Supp., 666.

PREJUDICIAL ERROR.—In prosecution for murder, in which testimony showed that both defendant and deceased had partaken of Jamaica ginger on afternoon preceding homicide, refusal to permit examination of witness as to where defendant and deceased got liquor *held* not prejudicial; source of the intoxicant being immaterial.

6. CRIMINAL LAW—TESTIMONY OF DECEASED'S MOTHER THAT HE WAS NOT INTOXICATED HELD COMPETENT, AND PROPER IN REPLY, WHERE DEFENDANT'S TESTIMONY SHOWED DECEASED HAD BEEN DRINKING.— In prosecution for murder, in which defendant and other witnesses testified that deceased had drunk Jamaica ginger throughout afternoon and into the night of the homicide, testimony of deceased's mother that deceased was not under influence of liquor on that evening was properly admitted as reply, and was competent evidence of deceased's condition.

7. CRIMINAL LAW—WITNESS MAY GIVE OPINION AS TO OTHER'S SOBRIETY OR INTOXICATION.—Witness in a position to know may give his opinion as to sobriety or intoxication of a person at a given time, if the evidence is otherwise competent.

8. CRIMINAL LAW—HOMICIDE—INSTRUCTION ADVISING JURY OF PUNISHMENT ON CONVICTION FOR MANSLAUGHTER HELD NOT PREJUDICIAL AND TO NOT INDICATE BELIEF IN GUILT.—In murder prosecution, instruction to jury as to sentence which would be imposed in case of verdict guilty of manslaughter *held* not erroneous because giving information as to punishment to be imposed or to indicate belief that defendant was guilty of manslaughter.

9. CRIMINAL LAW—ENTIRE CHARGE MUST BE CONSIDERED IN DETERMINING WHETHER TRIAL JUDGE COMMITTED PREJUDICIAL ERROR.— Charge of the trial Judge must be considered as a whole in order to determine if there was prejudicial error in any part.

10. CRIMINAL LAW—INSTRUCTION ILLUSTRATING LEGAL PROVOCATION NECESSARY TO REDUCE OFFENSE TO MANSLAUGHTER, AS KNOCKING ANOTHER OFF THE STREET, HELD NOT PREJUDICIAL.—Instruction relative to manslaughter that provocation must be some act of deceased which would create higher degree of passion, such as spit in a man's face, pull his ears, "or knock him off the street," *held* not prejudicial on account of illustrations used, on ground that knocking another off the street would justify homicide.

11. CRIMINAL LAW—EXPLANATORY OR APOLOGETIC REMARKS OF COURT BEFORE AND AFTER GIVING PREVIOUSLY OMITTED INSTRUCTION ON PRESUMPTION OF INNOCENCE HELD NOT TO CONSTITUTE IMPROPER MODIFICATION OF REQUEST.—Where, in murder prosecution, Court omitted to give requested charge concerning presumption of innocence, explanatory remarks that he had not said anything about that, and commencement of charge with words, "I further charge

you," and further remarks at conclusion concerning its omission, *held* not ground for reversal as constituting improper modification of the request.

12. HOMICIDE—PERSON ENTERING ANOTHER'S PREMISES TO SETTLE DISPUTE MAY NOT BE FORCIBLY EJECTED FOR FAILURE TO LEAVE IMMEDIATELY ON REQUEST, BUT IS ENTITLED TO REASONABLE TIME TO DEPART.—Party gaining admission to premises of another with avowed purpose of quieting a difficulty may not be forcibly ejected in case of failure to leave immediately on request, but is entitled to reasonable time to take his departure.

13. HOMICIDE—THIRD PARTY MAY USE VIOLENCE IN QUIETING ATTACK ON ANOTHER IF HE BELIEVES THERE IS DANGER OF OTHER'S RECEIVING SERIOUS BODILY HARM.—Third party may use violence in quieting an attack by one person on another, provided circumstances are such that he believes that other person is in danger of receiving serious bodily harm, and circumstances need not be such that third person would have reasonable ground to believe that felony was about to be committed.

14. HOMICIDE—INSTRUCTION THAT ONE IN POSSESSION OF PREMISES HAS RIGHT TO INVESTIGATE AND QUIET DISORDER THEREON HELD NOT ERRONEOUS UNDER EVIDENCE, IN PROSECUTION FOR MURDER OF DEFENDANT'S NEIGHBOR.—In prosecution of defendant for murder of neighbor, who, according to evidence, went into defendant's house or adjoining chicken yard, which both had right to use, on overhearing quarrel between defendant and his wife, instruction that one in possession of premises has right to investigate any disorder, and to request cessation of disorderly conduct thereon, *held* not erroneous as inapplicable to facts or as stating incorrect principle of law.

15. CRIMINAL LAW—INSTRUCTION THAT VOLUNTARY INTOXICATION WAS NO DEFENSE TO HOMICIDE HELD NOT ERRONEOUS, WHERE COURT REMARKED THAT HE WAS NOT INTIMATING FACT OF DEFENDANT'S INTOXICATION.—In prosecution for murder, instruction that voluntary intoxication would not excuse the crime, and that murderers would otherwise soak themselves in liquor, nerving themselves for the act, and sheltering their crime, *held* not objectionable as argumentative or charge on the facts, in view of Court's remarks that he was not intimating whether defendant was drunk or sober.

16. CRIMINAL LAW—INSTRUCTION, IN MURDER PROSECUTION, THAT CITIZEN HAS RIGHT TO INTERFERE IN HUSBAND'S FELONIOUS ASSAULT ON HIS WIFE, HELD NOT ERRONEOUS, WHERE COURT STATED HE WAS NOT INTIMATING FACTS.—In prosecution for murder committed on neighbor entering or approaching defendant's premises on overhearing quarrel between defendant and defendant's wife, charge that any citizen has right to interfere by using such force as may

be necessary, where husband is about to feloniously assault his wife with a deadly weapon, *held* not erroneous as indicating that such an assault took place, where Court stated to jury that he was not intimating anything about it.

17. HOMICIDE—CHARGE THAT CITIZEN MAY INTERFERE WHERE HUSBAND IS ABOUT TO FELONIOUSLY ASSAULT HIS WIFE HELD APPLICABLE UNDER EVIDENCE, IN PROSECUTION FOR MURDER OF NEIGHBOR.—In prosecution of defendant for murder of neighbor, who intervened during quarrel between defendant and his wife, in which defendant was shown to be under influence of intoxicants, and blood was found in or about chicken yard between the houses, and defendant's wife ran from the house at the late hour of the night scantily clad, charge that citizen has right to intervene, where husband is about to feloniously assault his wife with a knife or other deadly weapon, *held* not erroneous as inapplicable.

Before RICE, J., Colleton, Fall Term, 1925. Affirmed.

Harry Petit was convicted of manslaughter, and he appeals.

A portion of the charge of the presiding Judge was as follows:

(6) "I further charge you that, if a third party attempts to quiet a disturbance, and is told that his services are not needed, and that there is no danger of any one sustaining bodily harm from the disturbance, then it is the duty of the third part to leave the premises and not attempt any violence. If the third party is told to leave by those occupying the premises, then it is his duty to leave, and, if he remains, he does so at his own peril."

The Court: Now, Mr. Foreman, in that case, I will do the best I can. If Padgett, the man who was killed, heard a disturbance across in this house, and he thought some one was going to be injured there, in other words going to be a breach of the peace, and he went there to quiet the disturbance, and to prevent the breach of the peace, or to prevent some one from doing harm to the other, then he was no intruder. If he got over there, and there was no necessity for him to interfere, and he knew it was not, and should have known from the situation he found there, and he was

asked to leave the premises, to get out of the house, and the yard, then he should have gone, because after that he then would stand in the position of a trespasser; but, if he went over simply to protect some one, and if he thought some person in that house was about to receive some injury, then it was not only—had a right to go, but he should have gone; and then in that case he would not have been any trespasser. If there was no necessity for it, and, when he got over there, he found no necessity for it, and he was asked to leave the yard, and then he should have left. After that, when he found no necessity for him to remain, and if he found no necessity, no danger of any one being hurt, and then he should have left the yard, if he was requested to do so.

"I further charge you that before a third party can use any violence in quieting an attack by one person on another, the circumstances must be such that the third party will have reasonable cause to believe that a felony is about to be committed, and, if this reasonable cause does not exist, then the third party cannot intervene, and it is his duty to leave."

The Court: Now, I can't charge you exactly in those words, because it would not make any difference what some other person thought, and as common sense, and with his own eyes might have thought that there was danger of some one receiving serious bodily harm, and if so, then it was his duty to interfere to prevent some person—another person in that house from receiving serious harm.

"I further charge you that, if a third party enters the premises of a person on a peaceful mission, and is told to leave by the party occupying the premises, then it is his duty to leave, and the party occupying the premises has the right to eject him from his habitation, or its curtilage, and can use so much force as may be necessary to do so."

The Court: Now, the mere fact I could not charge that *in toto* as it stands there. The mere fact he might have remained for a short while, and he should be given, even where no person is in danger, no one was going to be hurt,

and if he got over there with the purpose of trying to protect some one from being hurt, and if he found no one was being hurt, and even if he was ordered out of the yard, then he did have a reasonable time in which to leave the premises, and would not justify any one, because he did not instantly leave, to cut him, or strike him, or kill him, or do any other harm, and he was entitled to a reasonable time in which to leave the premises, of course, he would not be justified in using any kind of violence, unless it was necessary to protect some one from being hurt.

The Court: You want me to charge further than that?

Mr. Jefferies: I think your last statement covers the balance of that last paragraph. That last statement "could not use any violence, unless it was necessary," covers that last statement.

The Court: What about the seventh?

Mr. Jefferies: I think your Honor has covered that.

The Court: Now, the eighth?

Mr. Jefferies: I ask your Honor to charge that.

The Court: I have not covered that entirely, and I will read it all if you desire for me to do so.

Mr. Jefferies: Yes, sir.

(8) "I charge you that the dwelling house of a man, where he lives, is his home, or castle, and he may repel force by force in the defense of his person, habitation or property, against one who manifestly intends and endeavors to do him bodily injury or to take his life; and in such case he is not bound to retreat, but may pursue his adversary until he has secured himself from all danger, and, if he kills his adversary it is excusable homicide." *State v. Brooks,* 79 S. C., page 148; 60 S. E., 519; 17 L. R. A. (N. S.), 483; 128 Am. St. Rep., 836; 15 Ann. Cas., 49.

The Court: That's correct law, Mr. Foreman and gentlemen. He may use whatever amount of force is necessary, or appears to him to be necessary, in order to protect himself.

Mr. Jefferies: No. 10, your Honor, please. No. 9, I think your Honor has covered it.

(10) "The jury is instructed that the fact that the defendant was only renting the premises on which the killing took place in no way affected his rights under the law. In other words, he had the right to act the same on the rented premises as he would have had, had the property been his own."

The Court: That's correct, the fact he might have been renting makes no difference as to the protection of his home. He was renting it, and he had the exact, the same rights to protect his home, while he was renting the place, and he was living there, and as if he owned it in fee simple.

The Court: Now the eleventh, I think I have covered that, and the twelfth I think I have covered that. If you want me to read them I will.

Mr. Jefferies: I would like for your Honor to read No. 12.

(12) "I have referred in the charge above to habitation, or castle, and I charge you that any portion of a man's dwelling, including the steps leading into the dwelling, is a part of the castle, and that if a defendant takes the life of a trespasser in defense of himself, or property or home within the dwelling or on the steps, or any other portion of the habitation, the killing is justifiable, and the verdict in such a case should be not guilty." 30 C. J., 82.

The Court: You take that, Mr. Foreman and gentlemen, in connection with what I have already told you.

The Court: Now the thirteenth. Now I do not remember the testimony, whether it occurred in the garden, or in the chicken yard?

Mr. Moorer: Occurred in the chicken yard between the two houses.

The Court: You mean the actual injury?

Mr. Jefferies: Our position, it occurred in the actual dwelling, and standing in the door, inside of the house.

The Court: I will charge it.

(13) "I further charge you that where a house, premises, yard or anything within the curtilage of a dwelling are jointly occupied, used and possessed by two persons; each joint occupant being entitled to possession, need not retreat when attacked while inside yard, building and premises. If you find that the defendant had the right in this case to use the places where the homicide occurred, and if said right also belonged to the deceased, then I charge you that the defendant in this case would not have to retreat in order to make out a plea of self-defense, provided, however, the defendant otherwise complies with the rules of self-defense as I have given them to you." 30 C. J., 72. *State v. Marlowe,* 120 S. C., 205; 112 S. E., 921. *State v. Bowers,* 122 S. C., 275; 115 S. E., 303.

The defendant's ninth and tenth exceptions are as follows:

(9) In that his Honor erred in modifying the defendant's sixth request for charge; the error being that a party gaining admission to the premises of another with the avowed purpose of quieting a difficulty is under the legal duty to leave the premises when he is told by those occupying same that his services are not needed and that no one is in danger.

(10) In that his Honor erred in modifying defendant's request for charge, the request and the modification being as follows, to wit:

"I further charge you that, before a third party can use any violence in quieting an attack by one person on another, the circumstances must be such that the third party will have reasonable cause to believe that a felony is about to be committed, and, if this reasonable cause does not exist, then the third party cannot intervene, and it is his duty to leave.

"The Court: Now, I can't charge you exactly in those words, because it would not make any difference what some other person thought, and as common sense, and with his

own eyes might have thought that there was danger of some one receiving serious bodily harm, and if so, then it was his duty to interfere to prevent some person—another person in that house from receiving serious harm."

The error being that his Honor by the charge in effect told the jury that a person seeking to quiet a domestic difficulty could act as he saw fit, and that he would not be governed by the elementary rule that a party's acts under any emergency should measure up to what a reasonable person would have done under similar circumstances. This modification was highly prejudicial to the defendant, in that there was testimony to the effect that the deceased had been drinking heavily, and for the trial Judge to charge that under the influence of whisky he could decide himself whether it was necessary for him to intervene in a domestic difficulty would completely destroy the rule of reason so well established by law, and such a charge was bound to prejudice the defendant before the jury.

The second, fourth, and fifth requests to charge on the part of the State, and the remarks of the Court concerning them, were as follows:

(2) "One in possession of any premises, or having the right to use the same, has a right to investigate, and quiet by peaceable means any disorder or breach of the peace thereon, and in doing so may request the disorderly ones to cease their disorderly conduct. If in doing so he is unlawfully assaulted by the disorderly person, it could not be said that he had brought on the difficulty by attempting to quiet the disorder."

(4) "If a person is in a state of voluntary intoxication at the time he commits a homicide, that would not excuse the crime. The Courts of South Carolina hold to the wise old doctrine that voluntary drunkenness, of whatever degree, is no excuse for crime committed under its influence. Any other principle would be destructive to peace and order of society. Otherwise, murderers might soak themselves in

liquor for the double purpose of nerving themselves for the act and of sheltering their intended crime." *State v. Bundy,* 24 S. C., 439; 58 Am. Rep., 263.

The Court: Now, Mr. Foreman and gentlemen, I am simply reading the request, and not saying anything about the facts of this case, whether this man is drunk or sober is for you, whether the defendant in this case was drunk or sober; and all these questions are matters for you, and I am not intimating to you one way or the other, that's a matter entirely for you to pass upon.

(5) "I charge you that, where a husband is about to feloniously assault his wife with a knife or other deadly weapon, any citizen has a right to interfere by using such force as may be necessary, to prevent the commission of the felony, even to the extent of taking the life of the husband attempting to commit the felony, provided that neither the wife nor such citizen is at fault in bringing on the difficulty."

The Court: I charge you that.

Now, I think, gentlemen, that is about all, unless something further the lawyers want me to charge.

Mr. Jefferies: I have nothing further.

Mr. Moorer: I think, your Honor, in stating back there, you might have charged upon the facts of the case.

The Court: Now, gentlemen, in charging the requests to charge to you I am not intimating whether this man was drunk or sober, that's for you to determine, and I have not got anything to do with that, or whether the man that was killed was drunk or sober, all of these questions are for you, and I am not intimating anything about it, and I do not think any one could infer that I have.

*Mr. R. M. Jefferies,* for appellant, cites: *Trial Judge erred in stressing indeterminate sentence act in charge, prejudiced defendant before jury:* 16 C. J., 1038; 85 S. C., 265. *Misleading instructions:* 16 C. J., 1036. *Prejudicial illustrations:* 105 S. C., 55. *A party who goes to the assistance of another does so at his own peril:* 78 S. C.,

253. *As to interference:* 110 S. C., 274; 121 S. C., 163. *Charge on facts:* 24 S. C., 439; 16 C. J., 1036. *Instructions not based upon facts in proof are erroneous and prejudicial and constitute reversible error:* 66 S. C., 449; 73 S. C., 60; 123 S. C., 24; 15 S. E., 677; 62 S. E., 1036; 122 S. E., 551; 90 S. E., 834; 120 S. C., 387; 16 C. J., 1043. *Cases distinguished:* 114 S. C., 291; 115 S. C., 535.

*Mr. Randolph Murdough, Solicitor* and *Mr. J. M. Moorer,* for the State, cite: *Admission of evidence as to friendly relations not error:* 115 S. C., 483. *Use of illustrations in Circuit Judge's charge not error:* 114 S. C., 291; 115 S. C., 535. *Charge that voluntary intoxication is not excuse for crime not error:* 24 S. C., 439. *"Vagabond":* Webster's New International Dict.

April 6, 1928.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The State charged Harry Petit with murder in the killing of Seward Padgett. The defendant pleaded not guilty, and affirmed that he killed in self-defense. There have been three trials of the case in the Court of General Sssions for Colleton County. The result of the first two were mistrials. In the third trial, Hon. H. F. Rice, Circuit Judge, presiding, Petit was found guilty of manslaughter, and was sentenced to serve from three to six years. He has asked this Court to review his trial, and to reverse the judgment therein.

There is much conflict in the testimony. Certain outstanding facts, however, appear. Petit, about 35 years of age at the time of the homicide, had married, some years before, a niece of Mrs. Alice Padgett, wife of Dr. J. B. Padgett. At the time of the marriage, and for many years prior thereto, the niece resided in the home of these relatives. At the time of the homicide, Petit and his wife and daughter, Aline, 11 years of age, were living gratis, or by renting, in a small house of Mrs. Padgett, situate about 20

steps from her own dwelling house. Between the two houses was the chicken yard of Mrs. Padgett. Petit had no regular occupation, but sometimes helped in Mrs. Padgett's store. Mrs. Petit was engaged in school teaching. With Dr. and Mrs. Padgett resided their son, Seward, the deceased, 19 years old. The two families seemed to be intimately friendly. Petit was given to excessive drinking of intoxicants at times, and Seward was not free from fault along that line.

On Sunday, March 2, 1924, the deceased and the defendant took a buggy ride, visited several places, and both of them partook of a concoction, with Jamaica ginger as the basis. They returned home in the night; each going to his respective place of abode. The mother of the deceased testified he was not drunk upon his arrival at home.

Previously, there had been quarrelling at Petit's house, due, as he frankly admitted, to the antipathy of Mrs. Petit to the husband's habits with regard to intoxicating drinks. In some of the times little Aline stayed at the Padgett home.

On the night of the homicide, after Petit's return from the ride, Mrs. Petit and Aline having already retired, there occurred, to put the best light on it, some differences between the defendant and his wife. The defendant says it came about because he insisted upon his little daughter getting up from her bed and making a fire, that he might warm, at which his wife protested.

From this time on there is considerable variance in the evidence. The theory of the State was, and it endeavored to so show by the evidence, that the defendant was quarreling with his wife; that there was serious probability of physical injury to the latter by the defendant; that the Padgetts heard the noise; that Mrs. Padgett called Aline to come to her home and spend the night, whereupon the defendant, with cursing, said that the child should not go; that Mrs. Petit was crying; that the defendant requested Mrs. Padgett to come to his home; that defendant and his wife, after a

struggle at the door, went from the house to the chicken yard of Mrs. Padgett. ˙In the meantime, Aline had gone into the Padgett home and had a conversation with her great aunt, the subject of which does not appear. Thereafter Mrs. Padgett asked her son, Seward, to go to the Petit home and quiet the difficulty, since, because she was only clad in her night garments, and the night was cold, she could not well go; that the deceased hurriedly put on a few clothes and left his house, going through the back door, and entered the chicken yard, where Petit and his wife were. In a very little while Mrs. Petit, dressed only in her night clothes, went to the Padgett home. Petit was heard to say, presumably to the deceased, "I will cut your damn heart out." Shortly thereafter the deceased returned to his house, entering by the front door, and was discovered to be cut and bleeding. It developed that he had been stabbed near the heart, and as a result of the wound he died a few hours later. Mrs. Petit and her little girl did not return to their home that night. Early the next morning the defendant left his home, and was arrested on a public highway by the Sheriff. The State had no actual eyewitness to the affray. It depended mainly upon what Mrs. Padgett could see and what she and her husband heard from their home, together with a little circumstantial evidence and admissions made by the defendant. Neither Mrs. Petit nor Aline were placed on the witness stand.

The only eyewitness to the homicide was the defendant, and his statement of the affair was, briefly, as follows: That he was renting the house in which he lived; that at the urging of the deceased he took the buggy ride; and deceased furnished the intoxicants; that there were no differences between them on the ride; that they returned to their homes that night and parted on good terms; that he and his wife quarreled, because his wife did not wish Aline to make the fire, as he desired; that his wife started over to Mrs. Padgett's, and he did not wish her to go; that he did not at-

tempt to beat his wife or daughter, and did not curse them; that Mrs. Padgett called to him, and told him to leave her place, and never put his foot on it again; that he ordered his child not to obey the call of Mrs. Padgett for her to go to the Padgett home, and that he requested Mrs. Padgett, in a pleasant manner, to come to his home; that the little girl went anyway, and his wife started to go, whereupon he caught her by the sleeve to bring her back into the house; that about that time the deceased got there, and asked the defendant, "What in the hell, I was doing," and defendant replied, "None of your damn business," and deceased told him, "You turn Ethel loose"; that he told deceased he was not hurting her, and that she was going back into the house with him, and for deceased to go on back, and attend to his own business; that the deceased then jerked him off the steps; that his wife told the deceased to go on back home, and he again told deceased to go home; that at the time he was standing in the door with one hand on his wife's sleeve and the other on the door; that he did not threaten to cut out the heart of the deceased; that the deceased knocked him down two or three times, and, about the third time, he got his knife out, and attempted to cut the deceased on his arm; that the deceased was larger than he; that he had no intention of killing the deceased, and the knife he used was a very small pocket knife; that the deceased left, and the defendant did not know of his critical condition, and went on to bed; that he left his home early the next morning because of the order given by Mrs. Padgett the previous night; that he was going to see his relatives, and from there he intended to go to Walterboro to surrender, when the Sheriff overtook him, and he was placed under arrest.

Of the fifteen exceptions made by the appellant, three, the first, fourteenth, and fifteenth, were abandoned. Four of the exceptions, particularly referred to later, relate to either the admission or rejection of testimony. Our general observations touching all these will be made together, and now.

We feel sure that one of the main reasons for much of the misunderstanding as to when evidence should be allowed, and when it ought to be refused, is due to failure to properly distinguish between the legal terms, "relevancy" and "competency," so often used in the law of evidence, and, too generally but erroneously, supposed to be exactly synonymous. Many efforts have been made by Courts, Judges, and law writers to define the words so as to differentiate them correctly. In all the definitions we have read of "relevancy," we have been impressed much with that given by the New York Supreme Court:

"The meaning of the word relevant, as applied to testimony, is that it directly touches upon the issue which the parties have made by their pleadings, so as to assist in getting at the truth of it. It comes from the French *relever,* which means to assist." *Platner v. Platner,* 78 N. Y., 95.

As to the other word "competency," or rather, "competent evidence," Black's Law Dictionary gives approval to this definition from Mr. Greenleaf:

"That which the very nature of the thing to be proven requires, as the production of a writing when its contents are the subject of inquiry."

In the "Preliminary Definitions" on the subject of Evidence, in Corpus Juris, there will be found a part of one sentence that expresses very clearly a thought we now have in mind, namely:

" * * * It is clear that evidence may be logically relevant and yet inadmissible because not competent, that is, because not the character of proof which the law permits in the particular case." 22 C. J., 65.

Irrelevant evidence is never, properly, admissible in a cause; competent evidence is always admissible; relevant evidence may, or may not, be admissible, depending upon its competency.

Taking together the approved definitions of "relevancy" and "competency" as they are to be applied in the introduction of evidence in the trial of a cause, a fair and brief statement of a rule to keep in mind, seems to us, to be this : *Any evidence that assists in getting at the truth of the issue is relevant, unless, because of some legal rule, it is incompetent.*

Under our system of jurisprudence, in the trial of criminal cases in the Courts of General Sessions, the Judges know in advance but little, if anything, of all the issues in a cause. The indictment is usually short and in general terms. The plea of the defendant in the first instance, upon arraignment, is that only of "not guilty." The indictment and the plea make the issue or issues—more often in the plural. While the defendant is generally informed as to the line of the testimony against him, upon numerous occasions he may yet be surprised at what some witness testifies. The situation of the State is even one of greater disadvantage, so far as to information on the whole case. While the prosecution may have been forced to disclose its testimony, or some of it, in a coroner's inquisition, a magistrate's preliminary hearing, or on application for bail, the defendant can never be required to disclose in advance his defense—not even in the main trial itself. So it often occurs that even attorneys in a criminal case are not fully advised as to all the issues that may arise therein, or as to the nature and character of the evidence to be presented by his adversary. Necessarily, then, a trial Judge is constantly called upon to decide hastily as to the relevancy and competency of proffered testimony. It is safe to aver that in nearly all important criminal trials of any great length irrelevant and incompetent evidence is received—due to the zeal of earnest lawyers and the lack of knowledge of the rules of evidence by witnesses. It is altogether reasonable, therefore, to believe that the conditions mentioned have

greatly influenced the making and maintaining of two just principles by this Court, to wit:

(1) The admission of testimony in a cause is largely within the discretion of the trial Judge.

(2) Unless the unsuccessful party can show that the admitted testimony was wrongfully accepted, or the rejected testimony was improperly refused, *and that the error was prejudicial to his cause,* there will be no reversal of the judgment.

Turning, then, to the consideration of the exceptions spoken of, we will dispose of the second and third together.

The first of these complains of error in permitting
3, 4   Dr. Padgett and his wife to testify as to the intimate relations existing between the respective families of the deceased and the defendant.

The other contends that it was improper to allow Mrs. Padgett to tell of her calling little Aline to her home and the reason therefor; namely, that it "was a common thing for her to do whenever they (Petit and his wife) got in a fuss."

As Mr. Chief Justice Simpson said, in *Blakely & Copeland v. Frazier,* 20 S. C., 144, the testimony appellant objected to "was a part of the history of the case." In the *Blakely case,* the Court, conceding that a certain paper offered in evidence may not have been competent, held there was no error, as it was a part of the "history of the case."

The testimony as to the friendly relations between the two families assisted in getting at the truth of one of the issues in the cause—the right of the deceased to go into the defendant's dwelling house, as claimed by the latter, or into the chicken yard, right at the house, as claimed by the State, at a late hour in the night, and his purpose in so going. If the defendant could have shown that the deceased and his family were on bad terms with defendant, testimony of that nature in his behalf would have been clearly admissible. Why not the converse?

The former friendly or strained relationships of parties to lawsuits, including that of the close relatives of the parties, are very often admissible in evidence. See *State v. Senn,* 32 S. C., 392; 11 S. E., 292. *State v. Bodie,* 33 S. C., 117; 11 S. E., 624; and *State v. Douglas,* 115 S. C., 483; 101 S. E., 648; 8 A. L. R., 656.

Again, the defendant himself stated in his testimony that Dr. Padgett and his wife were "apparently" good friends of his; that he and deceased never had a difference; and that prior to the difficulty Seward "had the right of" coming "over to defendant's house." Defendant also testified that he requested Mrs. Padgett to come to his home. She could not go, but sent her son instead.

It is earnestly insisted, however, that the statement of Mrs. Padgett was highly prejudicial to the defendant, as it informed the jury of prior domestic troubles between defendant and his wife, and created the impression in the minds of the jurors that the defendant was accustomed to abusing his family. We cannot agree with the argument advanced. If Mrs. Padgett's use of the word "fuss" caused the jury to think the defendant was guilty of assaults or abuses of his wife, then the defendant's use of the word would have to be explained in the same way. And the defendant, several times in his examination, admitted that on the night of the difficulty he and his wife were "fussing," and during this time he requested Mrs. Padgett to come to his house. He also admitted that his little girl went frequently to the Padgett home.

It has been held in this State that evidence otherwise inadmissible may be admitted as preliminary to a relevant inquiry. *Merchants' & Planters' National Bank v. Clifton Mfg. Co.,* 56 S. C., 320; 33 S. E., 750.

We have been pointed to no rule which declares the testimony incompetent, and certainly it was relevant.

Mr. P. M. Givens, witness for the defendant, testified that he saw the deceased and the defendant in the buggy at 3 o'clock on the afternoon preceding the homicide; that they had Jamaica ginger, and he partook of some of the concoction, "just a little." Defendant's counsel asked him, "where did they say they got the whisky from?" One of assistant counsel for the State objected. There was argument. Defendant's attorney insisted the evidence was competent, as it led up to the killing eight hours afterward, and showed the conduct of the parties. It is now said by appellant that the witness would have testified that deceased admitted he furnished the Jamacia ginger, and accordingly this would have been confirmation of the defendant's statement thereabout. Another of the State's assistant counsel, so the record shows, admitted in his argument that, if the statement "was made either by the deceased or the defendant," it would be competent—still he objected. The Court ruled that "where they got the liquor from" had nothing to do with their conduct, and that he could not see where the evidence was relevant.

To our minds, it would have been all right to have let the witness answer the question. But there was no prejudicial error in refusing to do so. When two men are on a drinking spree in the afternoon, and eight hours later one of them is killed by the other, it is material perhaps to inquire as to their drinking, but it matters little which of the two furnished the intoxicant. The question of who provided the Jamacia ginger was not an issue of any importance in the case. The issue, if any, along that line was, "Did either the deceased or the defendant drink Jamaica ginger?" There was plenty of evidence to convince the jury that both of them did.

In reply, the State was allowed to show by the testimony of the mother of the deceased that he was not under the influence of liquor on the night of the tragedy. The defendant made objection to this testimony

on the grounds that it was not in reply, and was only the opinion of the witness.

We think the testimony was in reply. The defendant testified that the deceased and himself drank about two pints of the Jamaica mixture. Other witnesses for defendant swore to drinking by deceased and of his conduct throughout the afternoon and into the night, which tended to show he was under the influence of intoxicants.

A witness, in a position to know, may give his opinion as to the sobriety or intoxication of a person at a given time, if the evidence is otherwise competent. 22 C. J., 599. In this instance, it was competent for the State to show that the deceased was not under the influence of whisky just prior to his going to the defendant's house.

The remaining exceptions pertain to the charge of the presiding Judge.

The Court, in stating the punishment for the crime of manslaughter, used this language:

" * * * Or you may return a verdict of guilty of manslaughter, and in that event it would be the duty of this Court to sentence him for not less than 2 years or more than 30. Under the recent Act of the Legislature, would have to be—run something like this, not less than 2 years, nor more than 4 years; or not less than 4 years or more than 8 years. In other words, within the limits which the presiding Judge thinks he ought to be sentenced, the minimum in that case, for instance, from 2 to 4 years, the maximum sentence he would serve would be 4 years, the minimum would be 2 years. If he should behave himself, and the officers thought he should get a good report, he would only serve one-half of the maximum imposed on him, that is to say, after he served that length of time, and he would be released and he would still be considered as serving the sentence and be at home; or you may find a verdict of not guilty."

By the sixth exception, the appellant asserts that the charge given was prejudicially erroneous, for the reason that

it was not in the province of the jury to consider the method
by which the Judge would be guided in imposing sentence;
and that, by the use of the language mentioned, the Court
indicated a belief that the defendant was guilty of man-
slaughter.

We fail to see the prejudice to his client that counsel
thinks there was. It was the privilege, really the duty, of
the Judge to inform the jury as to the respective punish-
ments provided by law for the crimes included in the indict-
ment. Information of this kind may be very helpful to a
jury in arriving at a proper verdict. The punishment meted
out by the law for the various crimes helps, too, to impress
upon the minds of the jurors the difference in the crimes.
The very last clause of the instruction complained of was to
the effect that the jury might *acquit* the defendant. If the
first part of the instruction conveyed any idea that the trial
Judge considered the defendant guilty of manslaughter, his
last words could be readily construed as an indication that he
thought him entirely innocent.

The seventh exception imputes error in the charge as
9, 10 to the law of manslaughter. The instruction was as
·follows:

"Now, what is a sufficient legal provocation? Now
words under the law, it does not make any difference what
that matters, for no words how harshly one person may
speak to another will constitute a sufficient legal provocation.
Well, then, words that are not accompanied by some effort
or attempt to do harm or injury to the other person, but it
must be some act of one person who is killed—which is
killed; and in which a man of ordinary prudence and courage
would create a higher degree of passion, such as spit in a
man's face, pull his ears, *or knock him off the street,* or some
smart indignity, might be some different ways, another
could act which is calculated to create a higher degree of
fighting in a man, and the law says, if that is done, and while

acting under the influence of the passion, and he strikes and kills the other, then it cannot be murder; it is manslaughter."

It is claimed that the illustrations used to define "legal provocation" constitute acts of aggression which would give one the right to act in self-defense. There is cited as authority for this exception the holding in *State v. Tapp,* 105 S. C., 55; 89 S. E., 394, to the effect, shortly stated, that in the trial of a cause the Court should not use the facts of another case as an illustration. We cannot see the applicability of that proposition here, for the Judge in this case made no reference to the facts of any other case.

Most of the illustrations given by the Judge, or ones similar thereto, have been used time after time in our Courts in explaining the crime of manslaughter, and they were proper to be given in this cause, for they could be used without any indication as to the Court's impression of the facts, since no evidence in the case pointed to instances of the kind named by the Judge.

The words in the quoted charge, especially complained of, have been italicized by us—"knock him off the street." It is is insisted that, *if one is knocked off the street by another,* the former has a right to apprehend danger of serious bodily harm, and would be justified in striking in self-defense, and that the resultant death of the aggressor would not be either murder or manslaughter, but a "justifiable" killing under the law ("excusable" should be the term rather than "justifiable").

We think the trial Judge, evidently, had in mind one of the illustrations often used in former days in charges on manslaughter, namely, that the pushing, brushing, or jostling, of one on the street or in a public place in a rude, angry, violent, or insulting manner was a sufficient legal provocation to reduce what might be murder to manslaughter. Perhaps, technically, the words pointed out should not have been used. We cannot see, however, that they were harmful in their use in the case at bar. One knocked off the street by his ad-

versary may, in slaying on that account, be guilty of manslaughter, or he may be guilty of murder, or he may be innocent of any crime. The act of knocking one off the street does not excuse the person so assailed for the taking of the life of his assailant, unless all the elements of self-defense are present at the time. And, if malice existed on the part of the slayer, and as a result of that malice the killing occurred, the knocking off the street would not even reduce the offense to manslaughter.

Under the well-known rule that the whole charge of the trial Judge must be considered in order to determine if there was prejudicial error in any part thereof, we must hold there was no prejudicial error as complained of. An examination of the full charge in the case causes us to believe that the jury could not have been misled to the disadvantage of the defendant, as to the instructions imputed to have been erroneous.

The defendant presented fifteen requests to charge to the Court. After the general charge, these were taken up. The Judge thought he had covered the most of them, and, to save unnecessary repetition, asked defendant's attorneys "to point out what you want charged." Thereupon one of the attorneys from time to time indicated by numbers those requests which he desired given. He called for No. 2 of his requests, which stated, it seems properly, the law as to the presumption of innocence which surrounds an accused person throughout his entire trial. When his attention was called to this request, the presiding Judge remarked, "Well, I have not said a thing about that. I simply told the jury the burden is on the State to prove the guilt beyond a reasonable doubt." The requested instruction, in its exact verbiage, was then read by the Judge. It commenced with the words, "I further charge you." After reading the instruction, the Court said:

"Well, I have not said a thing about that. I simply told the jury the burden is on the State to prove the guilt beyond a reasonable doubt. Now, which other one?"

The contention of the appellant, as stated in his eighth exception, is that the remarks of the Court preceding and following the giving of the request amounted to an improper modification of the request, and that the "presumption of innocence" doctrine was not, therefore, correctly stated. We are unable to agree with this position, for the record shows that the request was charged. The Judge, in his remarks, both before and after giving the request, seemed to be rather apologetic to the counsel or the jury, perhaps to both, because he had overlooked the legal proposition, contained in the request, in his general charge.

In order to understand Exceptions 9 and 10, and to 12, 13 keep this opinion from being entirely too long, the reporter will incorporate in his report that part of the charge of the presiding Judge, with his remarks and those of defendant's counsel, included between folios 467 and 483 of the printed record, and the two exceptions mentioned.

A careful reading of the instructions given by the Court are, in our opinion, complete answer to the allegations of error contained in the exceptions.

The appellant also asks reversal because of the granting of the second, fourth, and fifth requests to charge on the part of the State. These, and the remarks of the Judge as to them, will also be reported.

As to the second request, appellant's Exception No. 14 11 is contradictory within itself. It imputes error on the ground that the charge was on the facts. Later, it says in effect there was no testimony which made it applicable. We think the granted request was proper, for it contained a correct principle of law, and it bore upon the facts in the case—not the facts from the defendant's viewpoint, but from the theory of the State. There was some evidence to show that the difficulty occurred in the chicken yard, which both the deceased and the defendant had the right to occupy and use.

The case of the *State v. Bundy*, 24 S. C., 439; 58 Am. Rep., 263, is authority for the law as announced in the fourth request of the State. It is contended in the twelfth exception that the request was argumentative and a charge on the facts. If the allegation of error is correct, which we do not concede, the remarks of the Court, nevertheless, which were by way of modification of the request, cured any error.

Regarding the fifth request of the State, as charged, appellant urges that it was inapplicable, in that there was no testimony to the effect that the defendant was attempting to assault his wife with a knife or other deadly weapon; and that the request presumed and intimated such an assault. Soon after giving this instruction, the Court again repeated to the jury the information that he was not "intimating anything about it." The often announced statements of the Judge to the effect that he had nothing to do with the facts of the case, and that they were for the jury, were abundantly sufficient, we are confident, to cure any possible intimation otherwise.

And we think the request under consideration was applicable. It must be remembered that the State depended, to some extent, on circumstantial evidence to establish its case. It had no actual eyewitness to the admitted killing of the deceased by the defendant. The defendant was under the influence of a terrible concoction of Jamaica ginger—a fact admitted by him. There was a quarrel between husband and wife—also admitted by the defendant. Blood was found in or about the chicken yard. The deceased went to defendant's home to quiet whatever disorderly conduct was there. The wife ran from her home in the dead hour of the night, scantily clad. The deceased, soon thereafter, was wounded by the appellant with a knife —admitted by the defendant. Who can say that the defendant did not draw the knife, or attempt to draw, or threaten to draw, it upon his wife? We do not have to accuse him

of any assault, or threatened assault, of that nature. It is not our duty to dispute the accusation, if it was made. But these were some of the circumstances, and they were for the jury to consider.

Close reading of the record convinces us that the defendant had a fair and impartial trial. Perhaps minor errors crept in, as they often do in cases similar to the one at bar. We have been unable to find any error that we think was prejudicial. Therefore, it is the judgment of this Court that all the exceptions be overruled, and that the judgment of the Court of General Sessions of Colleton County be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE WATTS and MR. JUSTICE STABLER concur.

MR. JUSTICE COTHRAN (concurring in result) : I concur in the judgment of affirmance in this case, but wish to add the following observations :

I think that it is unfortunate ever to use the adjective "competent" as descriptive of *evidence.* A witness is *competent* to testify, for the reason that his qualifications as a witness are perfect. Evidence is *admissible,* for the reason that it is relevant, if presented in proper form, and is not in conflict with a rule of law.

I do not agree to the proposition that *in any case* the admissibility of evidence is a matter within the discretion of the trial Judge. I agree that, when technically the trial Judge had committed error in his ruling upon the admissibility of evidence, it may be held by this Court that the error was not sufficiently prejudicial to warrant a reversal; *but the admissibility of evidence is a matter of law,* in the decision of which he has no discretion.

MR. JUSTICE CARTER (dissenting) : I concur in the opinion of Mr. Justice Blease in this case, except as to the disposition of the thirteenth exception. As to this exception, I am not in accord with the views expressed by Mr. Justice

Blease, and most respectfully dissent, for the reasons I shall briefly state.

Under this exception, the appellant imputes error to his Honor, the presiding Judge, in charging the respondent's fifth request to charge, as follows:

"I charge you that, where a husband is about to feloniously assault his wife with a knife or other deadly weapon, any citizen has a right to interfere by using such force as may be necessary to prevent the commission of the felony, even to the extent of taking the life of the husband attempting to commit the felony, provided that neither the wife nor such citizen is at fault in bringing on the difficulty."

The error imputed to his Honor under this exception is as follows:

"In that his Honor, the Circuit Judge, erred in charging the State's fifth request for charge, the error being that said charge did not apply to the facts in the case, in that there was no testimony whatever to the effect that the defendant was attempting to assault his wife with a knife or a deadly weapon; that said charge was a charge upon the facts, and intimated to the jury that a supposed assault by the defendant upon his wife with a deadly instrument, for which there was no testimony, had been proven in the case, and should be considered."

While it is admitted that on the occasion in question there was loud talking at defendant's home, and that the defendant and his wife were fussing, because the defendant had come home intoxicated, a careful study of the record of the case, as far as I have been able to ascertain, fails to reveal any testimony tending to show that the defendant was about to feloniously assault his wife with a knife, or other deadly weapon, at the time in question, or on any other occasion. Respondent, contending that there was testimony which warranted the charge in question under this exception, calls attention to the testimony appearing in the transcript at folio 153, as follows:

Mr. Moorer, examining Dr. J. B. Padgett, father of the deceased:

"Q. Were you awake or asleep when Seward got there that night? A. I was awake.

"Q. What time of night did he come in? A. Between 10 and 11 o'clock.

"Q. Did you hear him talking to any one? A. I heard him talking to my wife.

"Q. Did he come into your room? A. No, sir.

"Q. Now, after he had gone to bed, was there any disturbance over in your neighborhood? A. Yes, sir.

"Q. Whereabouts? A. Loud talking over at the next house, at the Petit house where they were living.

"Q. Well, sir; how was the talking? Just tell what kind of talking it was? A. Loud talking.

"Q. Well, sir; I am talking loud. Was any other disturbance between them, other than loud talking? A. Like fussing.

"Q. Like fussing? A. Yes, sir.

"Q. Did you hear anything else outside of loud talking? Did you hear any cursing? A. I did afterwards; yes, sir.

"The Court: Talking loud?

"Witness: Yes, sir.

"Mr. Moorer: What else did you hear outside of the cursing? A. Cursing.

"Q. And what else beside cursing? A. Cut your damn heart out.

"Q. Before we come to the difficulty? A. Yes, sir."

Continuing, the witness, Dr. Padgett, testified:

"Q. Was the side door open at that time? A. Yes, sir; it was.

"Q. Well, when Seward got out there, what was said, and what did you say then? A. I heard Harry say, 'I will cut your damn heart out.'

"Q. How soon after Harry said that before any one came to your house? A. Mrs. Petit. Of course, Aline came first, and then Mrs. Petit.

"Q. And, after you heard Harry say he would cut his damn heart out, how soon after before Mrs. Petit got there? A. I could not tell you exactly, come right in.

"Q. How did she come? A. Through the chicken yard, and through the back way.

"Q. How soon after she got there, before your son got there? A. I do not know, sir."

Mrs. Alice Padgett, wife of Dr. Padgett, testified on this point to the same effect as her husband, Dr. Padgett. Mrs. Padgett on this point, being examined by a counsel for the State, testified as follows:

"Q. What sort of talk was going on between them at that time? A. Very loud talking.

"Q. Was it pleasant talking? A. No, sir.

"Q. State what sort of talk was it? A. They were quarreling.

"Q. They were quarreling? A. Yes, sir.

"Q. After your son went out the back way, and went through there, and relate what you heard then, and what happened? A. I heard Petit tell him, cut his damn heart out.

"Q. That he would cut his damn heart out? A. Yes, sir.

"Q. Well, how soon after you heard that before any one came over to your house? A. Mrs. Petit was there immediately."

This testimony, as I view it, shows clearly that the alleged threat on the part of the defendant was against the deceased, when he got to the defendant, and was not against the defendant's wife, and affords no ground of support for the charge in question to the jury.

Respondent further calls attention to the fact that the defendant on cross-examination, when questioned as to certain of his testimony at a former trial, admitted that he must

have stated at the former trial that he did not remember what time it was he got the knife out of his pocket. There is nothing in this, as I see it, which tends to show that the defendant was about to feloniously assault his wife with a knife or other deadly weapon; neither do I think such an inference can reasonably be drawn from the surrounding circumstances. That husband and wife were fussing, it is true, but it appears that the wife was taking care of her side of the "situation" all right, and, as I read the record of the case, as it appears in the transcript, I fail to find anything which tends to show that the defendant was about to feloniously assault his wife with a knife or other deadly weapon, or any circumstance from which such an inference could reasonably be drawn. I, therefore, conclude that the charge in question under this exception was not responsive to the facts in the case, and was prejudicial to the appellant.

The appellant further contends under this exception that in charging this request, at the instance of the State, his Honor, the presiding Judge, intimated to the jury that a supposed assault by the defendant upon his wife with a deadly weapon had been proven; that is, that the defendant at the time in question was about to feloniously assault his wife with a knife or other deadly weapon had been proven. I know that such was foreign to his Honor's intention, for no one is more desirous to be fair than the Judge who presided at the trial of this case, but I am inclined to think the language susceptible of the meaning attributed by the appellant, and that it was very harmful to the appellant, especially since it was given at the conclusion of the charge, leaving the language and instruction contained in the State's request impressed on the minds of the jurors, and I think very likely affected their verdict.

Further, I do not agree with the view that the error in thus charging the jury was made harmless by the closing remarks of the presiding Judge. Immediately following

this charge, the fifth request of the State, above quoted, the following occurred:

"The Court: I charge you that. Now, I think, gentlemen, that is about all, unless something further the lawyers want me to charge.

"Mr. Jefferies: I have nothing further.

"Mr. Moorer: I think, your Honor, in stating back there, you might have charged upon the facts of the case.

"The Court: Now, gentlemen, in charging the requests to charge to you, I am not intimating whether this man was drunk or sober, that's for you to determine, and I have not got anything to do with that, or whether the man that was killed was drunk or sober, all of these questions are for you, and I am not intimating anything about it, and I do not think any one could infer that I have."

It will be seen from this that the explanation made by his Honor, the presiding Judge, had reference to his charge on drunkenness of the defendant, and that his Honor made no reference to or explanation of his charge "that where a husband is about to feloniously assault his wife with a knife or other deadly weapon. * * *" I, therefore, do not think that the charge complained of by the appellant, under this exception, was at all helped or explained by what followed thereafter. Evidently, counsel for the State entertained some apprehension as to the correctness of this charge, when he stated to his Honor, "I think, your Honor, in stating back there you might have charged upon the facts of the case." But when his Honor made an explanation he made no reference to, or explanation concerning, the charge in question, and only referred to the alleged drunkenness of the defendant.

This error which I think his Honor fell into was due, perhaps, to the fact that his charge to the jury was given at night, following a long and tedious trial, when his Honor must have felt heavily the long strain he had been under, to which he called attention at the beginning of his charge.

I think the appellant's thirteenth exception should be sustained and that the judgment of this Court should be that the judgment of the Circuit Court be reversed, and the case remanded for a new trial.