13951

STATE v. FLOYD

(177 S. E., 375)

*Mr. N. J. Frederick,* for appellant,

*Messrs. T. C. Callison* and *Colin S. Monteith, Jr.,* for respondent,

November 27, 1934.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

From his conviction and sentence to death on a charge of rape, in the Court of General Session for Lexington County, the defendant Clarence Floyd, has appealed to this Court.

The crime charged against the appellant, who, in this opinion, will be referred to as the defendant, was alleged to have been committed in Lexington County on the night of Saturday, August 5, 1933. He was arrested the following Monday night, August 7th. A true bill was returned by the grand jury on September 11th, and the defendant was arraigned on that day. That procedure has long been in vogue in this State. The Courts of General Sessions, where criminal cases of serious character are tried, convene in the counties of our state, generally, but three times in each year. Being without counsel, the Presiding Judge, Honorable William H. Grimball, appointed four members of the Lexington Bar, McKendree Barr, Esq., Milo Smith, Esq., and Messrs. Hall & Hall, all of whom are highly regarded, to represent him. A defendant charged with a capital offense in this State for many years has been, and is now, entitled to three days after arraignment, if he demands it, before his trial is entered upon. We assume the proper demand was made in this case, for the trial was not begun until September 14th. It was concluded the following day.

Within the time required by the statute, notice of intention to appeal on the part of the defendant was given by N. J. Frederick, Esq., of the Columbia Bar, who was not of counsel in the trial Court, and that attorney has represented the cause of the defendant in this Court. For some reason, not explained to the Court, there seems to have been considerable delay in docketing the case for hearing here. Apparently, the Solicitor, legal representative of the State has not insisted that the defendant and his counsel comply strictly with the rules of the Court. Evidently, too, the Solicitor, in the matter of the appeal, has been exceedingly fair to the defendant. That officer stated at bar of the Court that he had once considered the making of a motion in the Court, under the rules, to dismiss the appeal, on the ground that it was frivolous and without merit, but, upon

reflection, since the result to the defendant was so very grave, he had concluded not to make that motion, preferring for the Court to give full hearing to the appeal.

The transcript of record contains only the exceptions and the testimony in full at the trial. There were seven witnesses in chief for the State. The defendant testified, and presented five witnesses in his defense. Every witness desired by the defendant to testify in his behalf, evidently, was present at the trial and did testify. There is not the least suggestion in the record, and none has been made in the argument in behalf of the defendant in this Court, that there was a failure to have in the trial Court any witness whom the defendant thought might give testimony beneficial to him. The State offered five witnesses in reply, one of whom, however, had testified in chief. The examination of the witness on the part of the State was conducted by the Solicitor. The examination of the witness in behalf of the defendant was conducted by Mr. Barr and Mr. Hall. The cross-examination of the State's witnesses by these gentlemen seems to us to have been quite thorough. We have especially noted that the cross-examination of the prosecutrix and her male companion, to whose testimony we hereafter refer very fully, on the part of Mr. Barr, a lawyer of considerable experience, and who is aggressive, was quite vigorous. Evidently, this attorney had some doubt as to the truthfulness of the testimony of these witnesses, and he did not hesitate to let them, especially Sutton, recognize the doubts he had.

It is to be noted that the exceptions make no complaint of error in the admission or rejection of evidence, or that there was any erroneous instruction to the jury on the law. There is not anywhere the slightest intimation that the presiding Judge was other than entirely fair to the defendant. To us the record indicates that he was very careful to safeguard every right of the accused. There is no suggestion that any member of the trial jury was prejudiced

against the defendant; and there is no charge that the jury, as a whole, was not composed of competent persons, drawn, summoned, and impaneled in a legal manner. Neither is it charged, as often has been done in cases of this character, that the defendant was unduly hurried to trial, or that he was tried in a hostile atmosphere. There is not any intimation anywhere that the venue of the case should have been changed from Lexington County, where the alleged crime occurred, and where the trial was had. It is not hinted in the record that the accused was denied the right of counsel in the broadest and most liberal interpretation of that guaranty to him, both under the Federal and State Constitutions. We are bound to assume, therefore, that in all respects the trial of the case was conducted in a thoroughly legal and orderly manner, and that no constitutional right of the defendant, state or federal, was violated.

The four exceptions refer mainly to the facts, as adduced in the evidence, and are as follows:

1. "There is no evidence to convict defendant on the charge of rape."

2. "The charge of rape is too palpably the after-thought of the man companion of the alleged victim, for reasons best known to himself, to support a verdict and sentence of death."

3. "The story of the manner and method of the commission of the act is not only too fanciful, chimerical, fairy-like, and contradictory not to raise a reasonable doubt, but is contrary to natural laws and the physical facts."

4. "The burden of disproving the alibi of defendant was on the State, and this it has failed to do."

The exceptions present only two legal propositions. One of those, referred to in the fourth exception, that the state has the burden of disproving the defense of alibi, is, perhaps, a little inaptly stated in the exception, but it is in practical accord with the present rule, adhered to in this State, as to the effect of that defense. This

Court, in the case of *State v. McGhee,* 137 S. C., 256, 135 S. E., 59, for the first time expressly declared that an alibi was not an affirmative defense, as it had been theretofore long held. In the *McGhee case,* the opinion of Mr. Justice Cothran in *State v. Deschamps,* 134 S. C., 179, 131 S. E., 420, on the matter of alibi, was adopted, and since the decision in the *McGhee case,* the holding there has been followed. The true rule then, quoting from the opinion of Mr. Justice Cothran, is stated in this language: "*   *   *   the so-called 'affirmative defense' of alibi is not an affirmative defense at all. It is simply evidence adduced by the defendant to sustain his plea of not guilty; that he did not commit the crime for the reason that he was not at the scene of the crime at the time of the occurrence. The burden was upon the state to prove beyond a reasonable doubt that the defendant was present at the scene of the crime and actually committed it. If the defendant offers evidence which generates a reasonable doubt in the minds of the jury that he was at the scene of the crime when it was committed, which of course would result from evenly balanced evidence upon this point, he should be acquitted."

The charge in the fourth exception, to the effect that the State failed to disprove the defense of alibi, interposed by the defendant, relates solely to the evidence in the case, and it will be discussed later.

The only other legal position taken in the exceptions is that referred to in the first exception. There, it is said that in the trial there was no evidence to convict the defendant of the crime, which it was alleged he had committed. The question of "no evidence" is, generally, a legal question; but, after all, the consideration of the complaint that there was "no evidence" involves the consideration of all the evidence adduced in the trial.

The second and third exceptions raise no legal question; they charge no error of law; they are argumentative only. Under well-recognized rules of the

Court, they might be summarily dismissed. After all, however, all that is contained in them, and what is contained in the fourth exception, are embraced in the first exception.

In the consideration of the appeal, we disregard all technical rules, recalling what was said for this Court by the late distinguished Chief Justice Watts in the State v. Bigham, 133 S. C., 491, 131 S. E., 603, 609, which was approved in the later case of State v. Hester, 137 S. C., 145, 134 S. E., 885, as follows: "It is not an open question any longer that in a capital case this Court will take notice of any error apparent on the record affecting the substantial rights of the accused, even though not made a ground of appeal."

But we must stay within the powers granted to, and within the limitations prescribed for, this Court in Section 4 of Article 5 of the Constitution, which declares that in a law case, and this is such, this Court is "a Court for the correction of errors at law under such regulations as the General Assembly may by law prescribe."

We shall endeavor to follow the true course laid out for us in many decisions of this Court, construing our duty under the constitutional provisions, the effect of which decisions, in harmony with what was said by Chief Justice Watts, was so well expressed by the clear-headed Mr. Justice Hydrick in State v. Johnson, 84 S. C., 45, 65 S. E., 1023, where the defendant was convicted of an assault and battery with intent to ravish, a capital crime. There, that learned jurist said:

"This court has so frequently held that its jurisdiction, in law cases, extends only to a review of alleged errors of law, and that it cannot set aside verdict and grant new trials, in such cases, on the ground of mere insufficiency of evidence, unless there is no evidence to support the verdict, that it is needless to cite the cases.

"However, in view of the gravity of the offense of which the defendant has been convicted, we are inclined,

by a liberal construction of his exceptions, to consider the question whether there was any evidence tending to support the verdict."

The story of the alleged crime was fully related in the testimony of John D. Sutton, the first witness for the State. That witness, a white man, married, with one child, a resident of the city of Columbia, was in the employment of a furniture company in that city as a salesman and collector for fifteen years continuously. His business took him often to the villages of Brookland and Cayce, in Lexington County, just across the Congaree River from Columbia. Sutton, for about six years previous to the crime alleged to have been committed in this case, was well acquainted with the prosecutrix, a young white woman, twenty years of age, and members of her family. He was often at their home, also in the city of Columbia, and frequently, in his automobile, conveyed the prosecutrix, and other members of the family, to and from their home. The prosecutrix had been married, but, at the time of the alleged crime, she was living apart from her husband, and there had been executed by and between them some kind of separation agreement. In the early hours of the night of Saturday, August 5, 1933, Sutton was in the city of Columbia, and rode in his automobile to the home of the prosecutrix. At or about 10 o'clock that night, at the instance of the mother of the prosecutrix, Sutton and the prosecutrix, supposedly, left the home in Sutton's automobile for the business part of the city, for the purpose of taking a message from the mother to her husband, who was employed at night, and to visit a drug store for the payment of an account of some member of the family for which Sutton had stood good. Soon after leaving the home, with the consent of the prosecutrix, Sutton drove to the home of Mr. A. W. Dickson at 131 Green Street, in Brookland, for the purpose of seeing Mr. Dickson on a matter of business. The prosecutrix remained in the car while Sutton went

into the Dickson home. There Sutton was told by Mr. Dickson that a Mr. Addy, whose given name was not known, who lived near a schoolhouse, either in Brookland or Cayce, not clearly declared in the evidence, was interested in the purchase of a radio. So about 10:30 p. m., Sutton, still accompanied by the prosecutrix, went to the house where he thought Mr. Addy resided. Upon going to or near that house, Sutton concluded no one was at home, and returned to his automobile, where the prosecutrix had remained. Upon leaving the home where Addy was supposed to have lived, Sutton and the prosecutrix, in the automobile, started back toward the City of Columbia. There were few houses in that immediate section. The road was not one much traveled. It was close, however, to a main public highway, leading from Columbia, by Brookland and Cayce, to the village of Edmond. After driving the distance of about half of a city block, Sutton drove his car to the south side of the road and stopped. His inquiry if the prosecutrix objected to his lighting a cigarette being answered in the negative, he proceeded to light a cigarette. The prosecutrix and he were "passing a few words," not recalled. At that time, an unknown negro came up to the car, the direction from whence he came not being known, but from appearances he had come from the direction to the rear of the car. The negro had a long, black pistol in his hand. Sutton had no weapon of any kind, not even a pocketknife. There was a full moon, and the night was very bright. The negro ordered Sutton to drive off the road into another little road, and the command was obeyed. At the direction of the negro, Sutton stopped the car; also, at his direction, he got out of the car; and at the command of the negro, the prosecutrix also got out. The negro proceeded to rob Sutton, searching him thoroughly, and took from him at least $100.00 in money, some of which belonged to him personally, but the greater part of which was money he had collected during the day for his employers. The negro also

took from him a tie pin and tie clasp. The negro proceeded then to rob the prosecutrix. He held her by her arm and took her pocketbook. This pocketbook only contained a dollar bill in money and a kodak picture of a younger sister, some twelve or fourteen years of age, of the prosecutrix. The negro talked much. He asked as to the picture, and was told by the prosecutrix that it was one of her sister. The prosecutrix told the negro to take the money, but not to take the picture, as it would do him no good. The negro said, "No, I will keep that picture, she may be my next one," and he put the picture in his pocket. The negro searched Sutton's automobile, looked at business cards that Sutton had therein, and took the car keys. He made Sutton and the prosecutrix walk a little distance together, during the time flashing his pistol and pointing it at them. Finally, the negro said to Sutton: "I will make you this proposition, if you will divide with me, I will give you the money back." Sutton understood what the negro meant by that language, but pretended that he did not know, and the negro repeated it. Sutton made no reply. The negro said: "If you don't talk to me, I am going to kill you." The prosecutrix told Sutton to say something; if he didn't, the negro "is going to kill us." Sutton pretending ignorance as to the meaning of the negro in the language he used, asked him what he meant. The reply was, "I mean with the young lady." The negro said, "Let me have the young lady, and he would give me my money back." Sutton told him that he could take the money, the automobile, the clothes, and everything, "but don't touch her." Sutton appeared to be "hot" and the negro got angry. He said to them, "G— d— you, I will kill both of you," and he also said, "I will take her and leave both of you here in the woods." Sutton testified that he could not express his feelings at that time; he did not know what to do, but he thought of his life "as the sweetest thing he had." The negro went close to the

pair, and said if Sutton did not mind him, he would kill him. The prosecutrix said, "Maybe we can go through with it, even if hard, but maybe we can go through with it and not be killed." The negro made Sutton go to some point, designated in the courtroom as being the distance from the fireplace to where the witness stand was. He made the prosecutrix stay where she was. When Sutton got to the appointed place, the negro caught hold of the arm of the prosecutrix. He saw then, evidently for the time, that she had on ear bobs. He looked at them, but said he did not want them. He looked at her watch, and asked her what kind it was. She told him that it was only a cheap watch, which a friend had given her, and there was no need of the negro taking that. He looked at a ring she wore, and remarked that it was a cheap one. The negro then told the prosecutrix to lay down. The ground was not very rough. The negro "just laid her down in the sand bed." He caught her by the arm and said, "Get down." The prosecutrix, according to Sutton, "held her nerve, and did what he told her." At the time, the negro was facing Sutton. The back of the prosecutrix was toward Sutton. The negro proceeded to have sexual intercourse with the prosecutrix. All the time he had his gun pointed at Sutton. If Sutton appeared to be moving, the negro would raise up from the position he occupied and flash the pistol at Sutton. Sutton saw an iron pipe, evidently a stake for a grazing cow. He backed himself up to that stake, and while the negro was still in the act of committing the crime on the prosecutrix, Sutton was working with the pipe to see if he could get it out. He had made up his mind, he said, that the negro was going to have to kill him. When he succeeded in getting the pipe almost out of the ground the negro observed what he was doing. The negro came over to him and said, "What the h— are you doing?" The negro saw that Sutton almost had the pipe out of the ground, and ran Sutton away from it. He said to Sutton, " That is a nice piece of iron and you

are liable to hurt me with it." The negro took the piece of iron pipe and stuck it under his arm, all the time holding his pistol. The negro then got Sutton and the prosecutrix together, and told them that he wished to ask them some questions. He said if the questions were not answered correctly, he would kill Sutton. He asked Sutton what his name was. Sutton, at first, would not reply, but at the suggestion of the prosecutrix, he told him who he was. Inquiries by the negro of Sutton as to where he worked, where the place was located, if Sutton was married, how many children he had, and the age of his one child, were all answered truthfully by Sutton. The negro also asked him, "Does your wife know you are out here?" Upon being informed that Mrs. Sutton did not know that her husband was at that particular place, the negro said: "I know Mr. Sutton is not going to say anything about it because he is married, and his wife would kill him, or run him off, if she knew it, and I know he is not going to say anything about it." He also made inquiries of the prosecutrix as to where she lived, and where she worked. Her first answer as to her residence was not a correct one, and the negro so said in effect, and then she gave her correct address. She told him where she had formerly worked, at a place on Main street in the City of Columbia. He asked the prosecutrix what she was doing out there, and her reply was, "I happened to be in the car with Mr. Sutton." The negro said to her, "You cannot afford to tell this." and she answered, "No, I would not tell it for anything." The negro said to her, "If I thought you would, I would kill you." According to Sutton, the negro was a great talker, but he did not talk so loud. In describing the conduct and words of the negro, Sutton said: "He seemed to be very excellent along that line, and his nerve was that of a brute, and it was straight as it could be." The negro, before leaving said, first, that the keys to the car would be found down the road somewhere, under a tin can, not so far away, and he told Sutton

and the prosecutrix that they were not to leave the place under one hour. The negro said he would leave the watches with them; that they were to look at the watches and see what time it was; that if they left before one hour, he had two or three fellows around the place, and one of these fellows would get them. Sutton thought this was false, and the negro's talk as to the nearness of confederates was "fishy." In the talk between them, Sutton told the negro that he had sickness at home, some one who was bad off, and he ought to be there. His purpose in telling that was to "play on the negro's sympathy." Finally, the negro came back with the dollar bill he had taken from the prosecutrix in his hand and the keys to the car. He called to the prosecutrix, who, at first, would not go to him. At the instance of Sutton, however, she went to the negro who gave her the keys. The negro said: "I will not give the keys to Sutton, because he would not mind me. I know you will stay here one hour." He returned the dollar bill to the prosecutrix, but said he would not give Sutton his money back. During the time the negro was committing the crime on the young woman, he said: "Lady, you certainly have got a lot of nerve. * * * All the other girls I have had contact with like this collapsed. * * * I have done this before, and I am not afraid to go anywhere." Finally, the negro left, going into the woods. Sutton estimated that the time spent by the negro with him and the prosecutrix to be from 10:45 p. m. to 12:30 a. m. As soon as the negro left, Sutton wished to drive off, but the prosecutrix was afraid the negro did have confederates near by, that they might be shot, and insisted that Sutton should not start the car right away, but in about ten to fifteen minutes, Sutton got the keys from the prosecutrix and started the car as quickly as he could. He drove out to the paved road, and stopped at a lunch stand, which he found closed, but some boys were there, and he inquired of them if either Mr. Glaze or Mr. Price, police officers, was around. Upon

being informed that neither of these officers was about, he rode on through the town of Brookland, and spent some time there trying, without success, to locate Mr. Glaze. The prosecutrix and Sutton then rode to the home of the former, reaching there about 1 o'clock in the night, and her mother was told of the occurrences. The mother and brother of the prosecutrix, with Sutton, carried the young woman to the Columbia Hospital, for it was thought by all of them, and suggested by some one, that the young woman should have quick medical attention. The prosecutrix was placed in charge of a nurse at the hospital, and at that institution Sutton related the rape occurrence. After taking the prosecutrix to the hospital, Sutton started in search of officers. At the corner of Hampton and Main streets in the City of Columbia, he ran across Officers Corley and Spires, and reported to them the robbery. He did not then inform the officers, however, of the alleged rape. He explained that his reason for not informing them of the graver crime at that time was because he thought the negro might be apprehended easier if the crime of rape was not reported. He described to the officers a tie pin, the glass set in which was broken, that had been taken from him by the negro. The officers and Sutton went to the town of Brookland, but found no one there who answered to the description Sutton had given of the robber. Through Sunday, Sutton continued his search for information, and with his brother visited the scene of the alleged crime, with the hope that some clue might be found; but the search was fruitless. On Monday, through a negro taxi driver, who lived in a house owned by Sutton's employer, he ascertained that a certain negro had on Monday morning purchased an automobile. This information led him to make inquiries about the defendant. Sutton gave the information he had received to Officer Glaze. On Monday night, the defendant, having been arrested and placed in a jail in the City of Columbia, the officers sent for Sutton. Upon visiting the

jail and seeing the defendant, Sutton identified him as the man who had committed the robbery. On that night, he told the officers, also, of the alleged rape of his woman companion. At Sutton's suggestion, some of the officers went to the house where the defendant lived in search of evidence, in the way of articles and the money taken from him and the young woman. In the defendant's room, Officer Corley, from a dresser, picked up a tie pin, the set in which was cracked across the face, and Sutton identified it as being the one that had been stolen from him on Saturday night previously. Sutton also described to the officers how the negro who robbed him had been dressed, and a pair of trousers, so Sutton testified, similar to the pair the assailant wore were found in this room. The tie pin was introduced in evidence and presented to this Court. The trousers were not offered in evidence, and Sutton explained that one of the officers had taken them from the house, and he did not know what had become of them. Sutton declared positively and repeatedly, both on direct and cross-examination, that he had never known or seen, to his knowledge, the accused before the night of the alleged crime. He testified, also, to the effect that he knew it would be embarrassing to the young woman and himself to bring the prosecution for rape and to testify in the trial, but that the offense committed by the accused had been such a grave one, that he felt it to be his duty to relate the whole story, that the law might be vindicated. In the Court he positively indentified the defendant as the robber of himself and the young woman, and as the person who had committed rape on the prosecutrix. He stated he knew him by his general appearance, especially his height, and notably by the tone of his voice. The condition of the negro on the night of the attack gave Sutton the impression that he had been drinking some intoxicant, or had taken some "dope"; but the witness did not smell any whisky.

At the request of counsel for the defendant, it appears that soon after Sutton began to testify there may have been a "separation" of all the witnesses for the state, under the direction of the Court. We may be in error in assuming that there was an entire separation of all the witnesses, but, clearly, the prosecutrix was not allowed to hear the testimony of Sutton. In her testimony, there were, as suggested by the counsel for the defendant, some variances from the testimony given by Sutton, mainly as to the language used by the negro in the things he said during the long time he spent with them and talked to them, and as to the time spent by the negro in their company, and the length of time Sutton and the young woman remained at the scene of the crime after the negro had left; but these variances were of rather minor importance. A close study of her testimony, and that given by Sutton, shows that in the material and important facts, the testimony of both witnesses agreed. She corroborated Sutton as to the latter's visit to her home on the fateful night; her leaving the home with him to see her father and to pay the drug store bill; the suggestion of Sutton that they go first to the town of Brookland; the visit to the Dickson home, and the later effort to visit the Addy home; the stopping of the car by Sutton to light the cigarette; the appearance of the negro with the long, black pistol; the robbery of Sutton, and then of herself; the questions asked of both Sutton and the prosecutrix by the negro, and their replies to those questions; the criminal assault upon her; the discovery by the negro of the attempt of Sutton to pull up the iron stake, and the completion of the pulling of that stake by the negro; the return by the negro to her of the dollar bill and the car keys, the keeping, however, by him of the picture of her younger sister; the search, after the alleged robbery and criminal assault, for officers in the town of Brookland; the return to the home of the prosecutrix, and the report of what had happened to her mother; the visit to the hospital, and the treatment

which had there been given to her. She thought the negro
was with them for two to two and one-half hours, and that
they did not leave the scene for from twenty to thirty min-
utes after the negro had left. She stated the pistol showed
her in the Court, as being the one taken by an officer from
the defendant, looked like the pistol the negro had on the
night of the attack. Having been married, and having under-
gone the experiences of a married woman, she was able to
say positively that the negro who robbed Sutton and herself
also had sexual intercourse with her. Her testimony was
positive to the effect that she submitted to that outrageous
conduct because she was in fear of her life at the hands of
the negro, who, all the time, had a pistol in his hand and
threatened to kill her. Her statement as to many of the
things the negro said, the remarks about the picture of
her younger sister, his lack of fear of the electric chair, his
statement that he had treated other white girls as he had
treated her, were, in the main, in harmony with the state-
ments of the negro as related by Sutton. Prior to the alleged
crimes, she had never seen the accused in her life that she
knew of. She had a good look for a long time at him on
the night of the attack. On Monday or Tuesday, following
that night, at the Columbia jail, she had seen the defendant
and had identified him as her assailant. After having been
examined quite fully by both the Solicitor and one of the
attorneys for the defendant, Judge Grimball asked the
prosecutrix: "Now, you know that in this case if the de-
fendant is convicted that it means he will die in the electric
chair. Are you positive that is the man over there?" The
reply of the young woman was: "I am positive."

A. W. Dickson testified that Sutton, as testified to by the
latter, did visit his home between 10:30 and 10:40 on the
night of Saturday, August 5, and that he told Mr. Sutton
that a Mr. Addy, who lived near the schoolhouse, was in-
terested in the purchase of a radio. He saw some one in
the car with Sutton, but did not know who the person was.

The mother of the prosecutrix testified of the visit of Sutton to her home on the night of August 5th, and the departure from the home of her daughter and Sutton about 10 o'clock in the night, for the purpose of taking the message to her husband and the visit to the drug store, of the return to the home by them about 1:10 a. m.; that Sutton and the young woman both were excited and nervous; that the daughter could scarcely talk, and of her being informed by both of them of the robbery and the rape. She told, also, of the visit to the hospital to have her daughter treated, and she said the prosecutrix still became hysterical in the dark. The mother knew, when Sutton was visiting at her home, that he was a married man.

Constable Glaze, of Brookland, told of the visit to his home on the night of August 5th by Mr. Sutton, accompained by Mr. Price, a night policeman. Sutton reported the robbery, but said nothing at the time about a rape having been committed. Mr. Glaze was very busy with two fellows whom he had already arrested, and could not attend to the robbery report by Sutton on that night. On Monday, having received some information from Sutton, he went on that night along the public highway to about the line of Calhoun County. The defendant, another negro man, and a negro woman, traveling in the direction from Orangeburg came to a filling station near where the officer was. They were traveling in an Oldsmobile automobile. The defendant told the constable that he was returning from Orangeburg, and had bought the automobile that Monday morning. The negro had a loaded pistol in the car, the one which was later offered in evidence. The officer arrested the defendant, and took him to Brookland, and later to the Columbia jail. Sutton came to the jail and identified the negro as the one who had robbed him, and described to the officers some articles that had been taken from him. He especially mentioned about a little pin that had a crack in its set being stolen from him. The officer went to the room of the defendant, at 1015 Lady

Street, Columbia, accompained by other officers and Sutton. Officer Corley found the pin, which Sutton had described, and Sutton identified it as belonging to him. The negro did not seem to be worried when he was arrested, and made no objection to going with the officer. He checked up on the purchase of the automobile, and ascertained from a receipt the negro had that the negro, on the Monday morning following the attack, had purchased an automobile at the price of $125.00, and had paid on that price the sum of $35.00 in cash. The defendant had $11.00 when he was arrested.

Essie Mae Andrews, colored, who ran a boarding house at 1015 Lady Street, Columbia, knew the defendant, who had roomed at her house for a short while. She saw him there about 8 o'clock on the night of August 5th, and about that time saw him come down the stairs from his room. She saw him also at his room on Sunday morning. Floyd's wife lived in this room with him. She did not see his wife on Sunday morning. She did not know if the defendant spent Saturday night in his room.

Officer Corley testified to the report of the robbery made to him by Sutton, of the latter's description of the tie pin he claimed had been stolen from him, and the identification of Floyd as the robber after the negro had been arrested. He also told of finding the tie pin, identified by Sutton as being his property, in the room of the defendant.

For the defendant, four colored women testified. The first of these, Beulah Johnson, said she had known the defendant for a little more than two months, and had seen him around 614 Blanding Street, Columbia, where the witness lived. On Tuesday, after the alleged crime, she heard of it; that the defendant spent the night of Saturday, when the crime was alleged to have been committed, at the Blanding street house. She had never known him to spend the night there at any other time. Pressed on cross-examination, her reason for knowing that the defendant had spent Saturday night in the

house was due to the fact that she had seen him there Sunday morning about 8 o'clock.

Mary Cowan, who also lived at 614 Blanding Street, testified that she saw the defendant at that house on Sunday morning. She heard him go out of the house on that morning, but she did not know if he was there Saturday night.

Estelle Bridges swore that she saw the defendant on Sunday morning at the Blanding street house.

Carrie Bell Camps testified that on Saturday night, when it was alleged that the crimes were committed, the defendant spent the night at the Blanding Street house, sleeping in the bed with her. He came to the place about half past 8 or 9 o'clock; was there all night, and she left him in the bed at 7:30 the next morning when she went to her work. The defendant had never spent the night with her before, but he had visited her upon a few occassions.

Sheriff Oswald testified that Sutton, in telling him of the alleged crimes of rape and robbery, told that the negro, who had committed the crimes, with a string, used for tying furniture, had tied his (Sutton's) hands behind his back to a stob driven in the ground. (This testimony was contradictory of a statement made by Sutton, when a witness, that he had not given that information to Sheriff Oswald. Sutton, when asked about the alleged statement to Sheriff Oswald, said that he told the sheriff that there had been a rumor that the negro had tied him to the stob, but such was not a fact. The prosecutrix, in her examination, had testified that the negro did not tie Sutton.)

The testimony of the defendant, in many respects, was very rambling. For that reason, it is quite difficult to give in proper sequence the things he testified to. The substance of his story, however, was as follows: Lately, he had resided at 1015 Lady Street, Columbia, but formerly had lived in Orangeburg. About half past 7 o'clock on the night of August 5, 1933, he left his home, and went to get an automobile to pick up some things he had moved. About 8:30, he was

on Washington Street; got his little money together; for ten or fifteen minutes stood around talking to some colored girls; was about a dance that was going on for a little while; stopped at an eating place; bought a sandwich and a cold drink; drank a half pint of whiskey; went to the place on Blanding Street, where he went to bed. Slept with a girl named "Sadie Bell" or "Carrie Bell," who was known to him as "Little Bit." Did not leave that place until Sunday morning, and did not get back to his own room until Sunday night. On Sunday morning, securing a taxi, he went to the place where he and his wife were living, and with his wife went out into the country. He admitted that he had been connected in a way with the stealing of some water hose in Orangeburg, and that he had been sent to the penitentiary for being connected with the theft of a shotgun in Orangeburg. He served in the penitentiary six months and nine days, leaving that institution on March 6, 1932. He had known Sutton around two or three years. Knew him some before he went to the penitentiary. The first time he met him was when Sutton, traveling in a truck, picked him up, and had him go to the Atlantic Coast Line freight depot to get a load of bed material and mattresses, for which service Sutton had paid him 35 cents. Sutton told him at the time that if he would stick around, he could help him to get a lot of extra money. He said Sutton made him promise then not to mention anything that ever happened, and that he must keep women out of his head. Two or three days after getting out of the penitentiary, while on Hampton Street, he saw Sutton on the opposite side of the street at the store of a white man named "Jake." He approached Sutton with a request for money, but was informed that he was not able to hire him, and that he did not need any one, but a little later Sutton gave him a quarter. A few days later, he again saw Sutton on Main Street, who took him in his car, rode him around, and talked to him. Then Sutton gave him a $10.00 bill and a note, and directed him to take the money

and the note to the prosecutrix at a café in the city. He did not know the lady then, but went to the place and found her. He gave her the note and money, but did not talk to her. Sutton, later in the day, gave him a quarter for delivering the note. Later, in July, he again took $15.00 to the prosecutrix for Sutton. He did not know the full name of the café, but knew a part of it, and described it as containing stools and chairs. From that time on, he and Sutton were together often. Sutton, so his story went, was engaged in the business of stealing and selling stolen automobiles. At various places in the City of Columbia, he would point out an automobile to the defendant, who would drive the car out into the country at night, and deliver it to some third person; oftentimes Sutton was in and about the place when the delivery was made. Two or three other colored persons assisted him sometimes in this traffic in automobiles, but he did not know their names, and he did not know any person to whom a car was delivered. Cars were also stolen in the city of Rock Hill. Sutton talked to him very freely from time to time, always cautioning him never to tell anything he knew, and never to admit that he knew him. On a couple of occasions, the prosecutrix had accompanied Sutton, in a car, while making trips to deliver the stolen cars. Upon one occasion, when a show was going on at the Governor's mansion, which, according to the defendant, was a block from the Jefferson Hotel, which, of course, was not in accord with the truth, Sutton took him to a grassy place, sat down with him, and began to tell him how he could make enough money for both of them. He said he wanted to do that the following Monday night, but he could not go, because his daughter had something to do over the radio, or she was going to sing over the radio. Sutton told him, also, of a trip he expected to make to Augusta, where he would get a suitable Chevrolet for the defendant to drive; that he wanted him to dress up like a chauffeur, and he gave the defendant a dollar to buy a chauffeur's cap. The

defendant, however, did not buy the chauffer's cap. It is not clear, but perhaps, $15.00 the defendant was to take to the prosecutrix was also spent by him for other purposes. Upon one occasion, when he had delivered a stolen automobile, the man to whom it was delivered gave him a package for Sutton. The defendant, examining the package, discovered that it contained $900.00 in bills. He stated, also, that he was in debt to Sutton for $35.00 in some other transactions. On account of the money he should have delivered to Sutton, he dodged Sutton for several days, even moved from the house where he formerly lived, so Sutton could not find him. Finally, Sutton did run across him on the street, cursed him, jerked him about, threatened to put him in jail for spending his money, pulled his necktie off, and took from him a pin, which Sutton claimed was his. Sutton threatened to have him put in jail if he did not pay the money. He promised to make payment. For the purpose of paying Sutton, he went to a place where he knew some whiskey was, stole the whiskey, got it into Columbia, and succeeded in selling it, but he did not pay Sutton his debt. The money he used for the purchase of the Oldsmobile automobile, the Monday morning after the alleged crime of rape had been committed, was a part of the money he had received from the sale of whiskey that he had stolen. He did not know, or did not tell, from whom the whiskey was stolen, or to whom it was sold. In his trips to and from the place where the whiskey was received, he traveled with people, white and colored, whose names he did not know. He and his wife had some trouble about another woman. George Elmore, a taxi driver, was after him about money due the taxi man for driving him around. He gave Elmore $10.00, according to the record, evidently a misprint for $1.00, although Elmore claimed that the defendant was due him $1.50, on Sunday or Monday after the alleged crime. After purchasing the car, he went to Orangeburg Monday. Returning that night, he was arrested by an officer, who

took from his car a loaded pistol and $11.00 or $12.00 in money. On the visits of Sutton to him at the jails, Sutton would wink at him, indicating that he was not to admit that he knew Sutton, which was in pursuance to the terms he had made with Sutton previously, and with the understanding that if he got into any trouble, Sutton would always take care of him. At the direction of Sutton, he had also stolen an electric drill from the stone steps at Elmwood Cemetery in Columbia. He turned the drill over to Sutton and another man whom he did not know, the two at the time traveling in a Ford car. He denied positively the commission of the crimes charged against him. He claimed ownership of the tie pin, identified by Sutton as belonging to him, which was taken from the defendant's room. He purchased the pin for 15 cents, but did not recall the place where he had bought it. He had stolen but one automobile himself, that of Mr. Cliff Langford of Orangeburg. He did not know where it was, but Sutton knew. The $900.00, which he was to deliver to Sutton, were left by him in his room. He would not pay the $35.00 he owed Sutton from the $900.00, for fear that Sutton would discover that he had the $900.00.

In the reply by the State, Officer Spires testified that on the night of his arrest, the defendant told the officers that he spent the night the crime was alleged to have been committed at 1605 Wayne Street with his wife's aunt, which place was a little over a block away from 614 Blanding Street, where the defendant, and his chief alibi witness Carrie Bell Camps, testified the defendant had spent the night. Mr. Spires also testified that the defendant was asked, in the presence of Mr. Sutton and the officers, if he knew Sutton, and the reply was in the negative. That Mr. Sutton had had no opportunity at the time of saying anything privately to the defendant. The witness also said that, so far as he knew, the police department of the city of Columbia, with which he 'had been connected for some time, had

had no report of the theft of an electric drill. Further, this witness testified that he had known Mr. Sutton for ten or eleven years, that he had never known of Mr. Sutton being connected with the stealing of any automobile, or any other wrongdoing, and that his reputation for veracity was good. Like testimony was given by Officer Corley as to the statement of the defendant as to spending the night at 1605 Wayne Street, and as to the good reputation of Sutton.

Carl Rodgers, proprietor of the café, in the City of Columbia, where the prosecutrix had been employed, testified that formerly she had worked at the place for two years straight, which employment terminated about one year before the time of the trial; that she had worked one week, from the 20th to the 27th of June, 1933, and had not worked for him at any other time. This witness also testified that there were no stools and no chairs in his café, as had been testified to by the defendant in his description of the place. From Rodgers' description, we judge that the seats used by diners were of the bench type, and built in.

Policeman Dreher, of Lexington, testified that, accompained by George Elmore, colored, who appears to have been the taxi driver that the defendant had transactions with, he visited the defendant in the Lexington jail; that in reply to a question to the defendant if he knew Sutton before the alleged crime, the defendant replied he did not know Sutton, and had never seen him before in his life. (In the examination of Dreher by the Solicitor, the latter referred to Elmore having been on the witness stand in the case. The record does not show that Elmore was a witness. From questions asked of Sutton, however, it appears that Elmore was in the Court, and was identified by Sutton.) Similar testimony to that of Dreher, as to statements on the part of the defendant, denying that he knew Sutton, was given by Sutton's brother, who also had visited the defendant in the Lexington jail. The brother said that the purpose of the

visit was to secure an admission from the defendant that he did know Sutton.

After a very careful reading and thorough consideration of the evidence, we are reminded of the impressive observations of Lord Hale, many years ago, in his discussion of the law of rape, when he said: "It is true, that rape is a most detestable crime, and therefore ought severly and impartially to be punished with death; but it must be remembered, that it is an accusation easily to be made and hard to be proved, and harder to be defended by the party accuesd, though never (ever?) so innocent." Russell on Crimes, *563.

Mr. Russell is also authority for the statement that the wise and experienced jurist, in his work, mentioned two remarkable cases of malicious prosecution for the crime of rape that had come within his own knowledge, and referring to these, Lord Hale concluded his remarks on the subject with these suggestions: "I mention these instances, that we may be the more cautious upon trials of offences of this nature, wherein the court and jury may, with so much ease, be imposed upon without great care and vigilance; the heinousness of the offence many times transporting the judge and the jury with so much indignation, that they are over hastily carried to the conviction of the person accused thereof, by the confident testimony, sometimes, of malicious and false witnesses." *Ibid.*

But the caution asked by Lord Hale was addressed to trial Judges and juries, who were required to judge of the sufficiency of the evidence, and to Appellate Judges, who, in his day, in England, were charged with the duty of reviewing the evidence presented in a cause, and who were given the power to set aside the verdict of a jury, when they had come to the conclusion that the verdict was unjust, or was not supported by reasonable and credible evidence. While we may properly suggest to trial Judges and juries in this State that they exercise, in cases of this character, the care

and vigilance urged upon them by Lord Hale, still we have not the great reviewing and reversing power intrusted to that distinguished jurist and his associates in the administration of justice—a power, if possessed, to be used with the utmost care.

If the charge made against the defendant was "palpably the afterthought of the man companion of the alleged victim," if "the story of the manner and method of the commission of the act is not only too fanciful, chimercal, fairy like, and contradictory not to raise a reasonable doubt," and was "contrary to natural laws and the physical facts," or if the State failed in "disproving the alibi of defendant," the jury made a terrible mistake when it concluded to believe the testimony of the witnesses for the state, particularly that of the prosecutrix and her companion. The circumstances of the alleged crime, as related by the prosecutrix and Mr. Sutton, are not similar to any crime of that character committed in this State, or elsewhere, so far as we are advised, but we must not be unmindful of the fact that, unfortunately, at this time, there is raging throughout America a tempest of crimes, some of them old in name, but which are being committed with such new boldness and daring as to not only bring amazement to law-abiding citizens, but which appear to challenge civilization itself. We realize, too, that some people, especially white South Carolinians, who have a horror at even the thought of a white woman being subjected to the embraces of a negro brute, will not approve, or even understand, the conduct of Sutton in not resisting, even at the sacrifice of his own life, the commission of the terrible crime he swore he witnessed. Many will not agree with the feeling he expressed, that life is "the sweetest thing." His conduct will be explained to some only by his evident feeling that his associations at the time and place with the young woman were such as to bring to him a personal embarrassment, and that within his soul

was that feeling of conscience "that makes cowards of us all."

But under our judicial system, ordained in the Constitution of this State, the system which our people, both of this State and of the nation, have declared to be the one they wish, the one representative of a free people, it is impossible for us to hold that there was no evidence to support the truth of the commission of the crime charged against the defendant. Moreover, we cannot say that the verdict was not fully warranted, under the evidence presented to the jury.

The conduct of Sutton in failing to fight, with his life, for the dearest possession of the young woman, and his failure to report promptly to the officers of the law the commission of the crime, were questions to be considered by the jury. The little variances between his testimony and that of the prosecutrix were matters for the jury. The failure to call to the witness stand the interne at the hospital who, the prosecutrix testified, treated her after she had been ravished, was something for the jury's consideration. The suggestion of appellant's counsel that the story told by Sutton and the prosecutrix to the mother of the latter was for the purpose of explaining the return at such a late hour of the night of the girl and Sutton to the mother's home was for the jurors. The fact that Sutton, without the assistance of the officers, discovered the first clue, the purchase by some negro, unknown to him, of an automobile, in the City of Columbia, on Monday following the night of the alleged crime, and that this negro turned out to be the defendant, was for the jury's consideration. The further fact that it was Sutton who made the suggestion to the officers that the little tie pin, which he claimed had been stolen from him by the robber and rapist, might be found in the room of the defendant, was something for the jury to think about. All these matters, and perhaps others, we may properly assume were called to the attention

of the jury in the arguments of counsel for the defendant. Even if some one of them was not mentioned to the jury, who say that some one of the twelve men, who tried the defendant, did not think of it and call it to the attention of his fellows?

We must not overlook, too, that the jury had the sworn statement of the young white woman as to the alleged crime. She was corroborated in that story by Sutton, and there were, if the facts testified to were true, circumstances to support the testimony of both these witnesses. The tie pin, claimed by Sutton, found in the possession of the defendant, if it was his pin and had been stolen from him, was evidence to support the testimony given by them. The long, black pistol, found by the officer in the possession of the defendant, corresponding to the pistol held over her by her assailant, as testified to by the prosecutrix, was corroborative of her story. The possession of sufficient money to pay the first installment on an automobile on Monday, following the alleged crime, when just before that, with the exception of the $900.00 of Sutton's money, which the defendant claimed to have hidden away, the defendant was without funds sufficient to pay his little debt to the taxi man, was a circumstance against the defendant as to his presence at the scene of the crime. The story of the defendant as to Sutton's associations with him in the stealing of numerous automobiles, unsupported by any other testimony, may have been, evidently as the jury thought, an entire concoction of falsehoods. The alibi claim of the defendant had support from only one witness, and she a woman of bad character. That alibi was discredited, too, by the testimony of the officers that the defendant, in his first claim of alibi, had given them a place other than the one which he had testified to as being the house in which he had slept.

All the evidence, and the credibility of the witnesses who gave it, were, under the law, matters for the determination of the jury, who were sworn to give

the defendant a fair and impartial trial, and who, it must be assumed, since nothing in the record appears to the contrary, were fully instructed by an able and impartial judge, that the defendant's guilt had to be established by the state beyond a reasonable doubt.

Some matters appearing in the printed brief, submitted for the defendant, do not appear to have foundation of fact in the transcript of record, and for that reason, if we should follow the usual custom of the Court and our rules, we would not refer to these, but for the purpose of giving the defendant all consideration, we go beyond what the rules require us to do. It is said: "The appellant (defendant) was arrested two days after the alleged crime and kept in jail without the opportunity of communicating with any one. Manifestly, it was impossible for him to collude with anyone so as to uphold or establish his alibi." The defendant, and none of his witnesses, testified that he had been denied any opportunity of communication with his friends or witnesses. The very fact that Sheriff Oswald, of Lexington County, who had the custody of the defendant while he was in the Lexington County jail, testified in the defendant's behalf, contradicting the testimony of Sutton in a matter which may have been of considerable importance, is sufficient, we think, to show that the sheriff was entirely fair to the defendant, and would have permitted him any reasonable opportunity to confer with his relatives, friends, counsel, and witnesses. It does appear in the evidence, too, that Mr. Milo Smith, one of the counsel assigned by the Court to represent the defendant, before he was assigned, had visited, with others, the defendant in jail. Surely, if Mr. Smith was permitted to visit the defendant at that time, Sheriff Oswald, who showed by his conduct that he was absolutely fair to the defendant, did permit him, if requested, to have visits from those interested in his defense.

It is suggested, too, by counsel for the defendant, that there has not been the proof required under the law as to

the identity of the defendant as the guilty party, even, so we think he intends to say, if it be conceded that the crime of rape was committed. Casting aside entirely the identification made by Sutton, the testimony of the prosecutrix alone, if the jury believed it, as their verdict shows they did, was entirely sufficient, under the law, on that issue. Her testimony of her experiences with the defendant for two hours may be well remarked upon in the identical language used by Mr. Justice Fraser, in affirming a judgment of conviction for assault with intent to ravish, where the issue of the identity of the accused was one of great moment. In his characteristic way, that Christian jurist said of the testimony of the woman alleged to have been assaulted: "The prosecutrix spoke without doubt, and well she might speak with assurance. Her experience, if such she had, was calculated to indelibly stamp the face of her assailant on her mind. She was in a position to speak with assurance." *State v. McNeal,* 103 S. C., 197, 87 S. E., 1004, 1005.

In the study of this case, we have not only devoted much time in the examination of the record, and consideration of the brief of the defendant, but we have resorted to every one of the decisions of this Court that we have been able to discover, and we think we have found them all, in which were involved questions relating to the crime of rape, and its kindred offenses, assault with intent to ravish, and the having, and attempting to have, carnal intercourse with a female under the age of consent. This course we have pursued for the purpose of aiding us in discovering any error of law committed in the trial in the lower Court, which might have affected any substantial right of the defendant, which we should do under the rule announced in *State v. Hester, supra.*

Of the seventeen cases, we find that judgments against the accused in the lower Courts were affirmed in twelve. *See State v. Le Blanc,* 3 Brev. (5 S. C. L.), 339, Id., 1 Tread. Const. (6 S. C. L.), 354; *State v. Haddon,* 49 S.

C., 308, 27 S. E., 194; *State v. Sudduth,* 52 S. C., 488, 30 S. E., 408; *State v. Coleman,* 54 S. C., 162, 31 S. E., 866; *State v. Johnson,* 84 S. C., 45, 65 S. E., 1023; *State v. Dawson,* 88 S. C., 225, 70 S. E., 721; *State v. McNeal,* 103 S. C., 197, 87 S. E., 1004; *State v. Pearson,* 103 S. C., 481, 88 S. E., 255, 256; *State v. Butler,* 114 S. C., 433, 103 S. E., 762; *State v. Green,* 121 S. C., 230, 114 S. E., 317; *State v. Boyd,* 123 S. C., 24, 115 S. E., 809; and *State v. Wilson,* 162 S. C., 413, 161 S. E., 104, 81 A. L. R., 580.

In the *Le Banc case,* decided in 1813, the Constitutional Court, corresponding to what is now the Supreme Court, affirmed the judgment against the defendant, who had been convicted of having carnal knowledge of an infant girl, under the age of ten years. The appellate Court then had the power not now given to this Court to grant a new trial if the verdict was clearly against the evidence. See *Hudson & Morrison v. Williamson,* 3 Brev. (5 S. C. L.), 342; Id., 1 Tread. Const. (6 S. C. L.), 360, the first case reported after the *Le Blanc case,* and decided at the same term. In *Le Banc's case,* practically all the testimony against the accused, both as to the crime and as to his identity, came from a little girl, seven years of age. Against that testimony, the defendant offered, in support of his vigorous denial, the testimony of another witness who, it was claimed was present when the little girl visited the barber shop of the accused at which place the crime was said to have been committed. Mr. Justice Nott, with the concurrence of all the Justices of the Constitutional Court, said: "But finally, if the facts as proved are true, the moral guilt of the defendant is sufficiently established; and the jury having thought it legally proved, I am not disposed to look with eagle's eyes, to see if I cannot, by some legal subtlety, rescue him from the punishment he so justly deserves."

As the little tie pin, with its broken set, may have played an important part in the case against this defendant, so a small article contributed much to the conviction of the ac-

cused in the case of the *State v. Green, supra,* where the judgment of the lower Court was upheld. A sleeve button, shown to have been owned by Green, was found in the bed on which a little girl, the victim of the alleged attempted rape, was sleeping.

While the crime of rape is usually committed, or attempted to be committed, when no one other than the victim and her assailant are present, in at least one case, reported in our decisions, there was present a third person when the assault was said to have taken place. That happened in *State v. Pearson, supra.* The intending rapist attacked the victim while another woman and she were sleeping together in a bed; all the parties were negroes. In affirming the judgment of conviction, the able Mr. Justice Gage, for this Court, used certain language, here quoted, which is singularly applicable to this case: "This testimony made the bare issue of who swore the truth, and that was surely for a jury of the vicinage. If the state's witnesses are to be believed, the transaction was a shocking case of assault with intent to ravish; and the full force of its realization is only arrested because of the social status of the parties to it, the supposed moral inferiority of their race, and the terrible penalty the jury has put upon the offender."

In five of the cases appealed to this Court, there were reversals of the convictions on errors of law, committed by the respective trial Judges, and the cases were remanded for new trials. See *State v. Taylor,* 57 S. C., 483, 35 S. E., 729, 76 Am. St. Rep., 575; *State v. Johnson,* 85 S. C., 265, 67 S. E., 453; *State v. Sanders,* 92 S. C., 427, 75 S. E., 702, 42 L. R. A. (N. S.), 424; *State v. Kelly,* 114 S. C., 336, 103 S. E., 511; *State v. Wallace,* 122 S. C., 520, 115 S. E., 811. In all of these, the Court left the ultimate decision as to the facts to the jury.

In only two cases, those of *Sanders* and *Kelly, supra,* did the Court, in reversing the convictions, direct verdicts of acquittal in favor of the accused. It was held, properly, in

both cases, that when there was *no evidence* to support the verdict, it was the duty of the Court to so declare, and to direct the entry of a verdict of not guilty. The gist of both of the decisions was that the assault established by the evidence did not, under the law, show an intention to commit rape.

All of our decisions, touching the subject of the crime of rape, and offenses of a similar character, as well as all of our decisions in all of our criminal cases, handed down since the adoption of our present Constitution, as well as numerous decisions rendered prior thereto, following the adoption of the Constitution of 1868, are in complete accord to the effect that when there is any evidence, though it may appear to be weak, tending to show that the crime of rape has been committed, and that the accused was the offender, then there is but one duty of the trial Judge; that duty is to submit the issues to the jury. Further, when it appears to this Court that there was any evidence tending to establish the affirmative of those issues, and no error of law affecting any substantial right of the accused appears, then it is the solemn duty of this Court to affirm the judgment.

After the preparation of the foregoing opinion, following the usual custom of the Court, it was submitted by the writer to the other Justices. Mr. Justice Bonham and Mr. Acting Justice Cothran have submitted dissenting opinions; their views, however, are in accord. Because the other members of this Court, like the dissenting Justices, are careful to guard every legal right of one sentenced to death for crime, we have again gone carefully into the case, studying it in connection with the views expressed in the dissenting opinions. It seems to be admitted therein that the objections raised to the affirmance of the judgment are quite technical. Our study of the record convinces us that these objections are not only technical, but they are without the least substantial foundation.

All the matters urged for reversal of the judgment relate entirely to the receipt of testimony, to none of which any objection was offered at the time it was received. In this Court, although the counsel for the defendant here has had extended experience in representing, in this Court and in the Circuit Courts, defendants charged with serious offenses, he has not regarded the errors complained of in the dissenting opinions as being worthy of sufficient notice to be used as the basis of an exception. Nevertheless, *"in favorem vitæ et libertatis,"* we disregard any failure of counsel for the defendant in the Circuit Court, or his counsel in this Court, to take advantage of any legal error committed in the trial, and we turn our attention to the matters presented, as reason for reversal, in the dissenting opinions. Where we can, for the sake of brevity, we group some of those matters.

The conversation Sutton had with Mr. Dickson, ▮▮▮ prior to the alleged attack, as related by both these witnesses, and the testimony of the prosecutrix as to what Sutton told her as to the trip he had to make when they were leaving her home, are so closely connected that they may be treated together. All these conversations were merely explanatory of the purposes of the trip taken by Sutton and the prosecutrix; they were merely preliminary matters; none of them had any bearing of the least importance on the one main issue in the case, the guilt or innocence of the defendant on the charge of rape.

The reference in Sutton's testimony to what "a boy told him," and the conversation, it is said, Sutton told of having with "Mac," may, also, be considered together. This testimony related to Sutton's search for peace officers, after the commission of the alleged crime. He testified that at a café, or lunch stand, in New Brookland, he asked people standing there the whereabouts of some officers he knew, and was told by a boy that the officers had gone. On cross-examination, he said that the café was run by a fellow whom he thought was named "Mac." He did not relate any conversation he

had with "Mac." Of course, there could be no objection to testimony on cross-examination, properly in response to questions put to the witness. The purpose of that cross-examination was to test the truthfulness of the story related by Sutton. The matter of the conversation with the boy, like other matters before mentioned, was simply a preliminary one.

Those particular matters were, as stated by Mr. Chief Justice Simpson, in *Blakely & Copeland v. Frazier,* 20 S. C., 144, which holding was approved in the *State v. Petit,* 144 S. C., 452, 142 S. E., 725, "a part of the history of the case." Even if objection had been made thereto, the substance, at least, of these conversations would have been admissible. The prosecutrix, Sutton, and Dickson only testified as to preliminary matters, going to show where the prosecutrix and Sutton were, and what was the purpose of their visits. The inquiries for officers on the part of Sutton were preliminary to the matter of giving a report that the crime of rape had been committed. The rule in this state is that evidence otherwise inadmissible may be admitted as preliminary to a relevant inquiry. *Merchants' & Planters' National Bank v. Clifton Manufacturing Co.,* 56 S. C., 320, 33 S. E., 750; *State v. Petit, supra.*

The testimony of Sutton as to the inquiries of the officers about the stick pin, and what they said upon finding it, and the testimony of Messrs. Glaze and Corley, as to what Sutton said in describing the stick pin in the room of the defendant, may be referred to at one and the same time. It must be remembered that Sutton testified that this pin had been taken from him by the robber and rapist. The pin, Sutton claimed had been stolen at the time of these crimes, was claimed by the prosecution to have been found in, or on, the dresser in the defendant's room. The defendant claimed ownership of the pin, and denied that Sutton had ever owned it. The main fact was as to the ownership of the pin. Had it belonged to Sutton, or did it

belong to the defendant? Sutton was fully examined and cross-examined as to the pin, and told where he had purchased it. The defendant, in his examination, only knew that he had bought the pin, but could not tell the place where it had been purchased by him. Sutton, in reporting the crime to the officers, described the pin which he claimed had been stolen. When the pin was found, he identified it as being his pin. All that the officers said, all that Sutton said, and all that the defendant said regarding this pin was only incidental and preliminary to the real issue—was the pin stolen from Sutton on the night of the crime? The examination and cross-examination of Sutton as to what he had said and done regarding the pin tended to either confirm or deny his positive testimony that the pin found in the defendant's room was his property. There was direct evidence as to the matters of the ownership and identity of the pin, and the declarations as to the description of the pin, and its finding were only incidental to the direct evidence. The evidence, even if objectionable, cannot, therefore, be made the basis of reversal of the judgment.

"Where there is direct evidence as to the same matters as to which a party's declaration has been admitted in evidence against the objection that it was self-serving, the admission of the declaration, even if technically improper, cannot be regarded as prejudicial error." 22 C. J., 230.

"Testimony that a witness received certain information, which had previously been testified to by the party giving the information, and upon which the witness acted, is admissible, not as independent evidence to establish the truth of such information, but as an inducement and an explanation by the witness that, acting on such information, he discovered other facts connecting the accused with the crime with which he was charged." *Coleman v. State,* 127 Ga., 282, 56 S. E., 417 (Syllabus).

Sutton did not testify, as the dissenting opinion suggests, anything that "the officers said about hoping to catch the

defendant." At folio 85 of the record, it does appear that when he reported the robbery to Officers Corley and Spires, these gentlemen told him that, perhaps, the man who had committed the crime might "cross the bridge" (the bridge over the Congaree river between the City of Columbia and New Brookland). No reference whatever in that conversation was made to the defendant as being the man who was sought, and his name was not mentioned in that connection in Sutton's testimony.

The objections, under the letterings "f," "g," "h," and "i," as to testimony of Sutton, have reference to matters brought out on his cross-examination, for the evident purpose of discrediting the story he had told, particularly as to his movements on the night of the alleged crime, his location of the place where the crime was said by him to have been committed, and his relationship with the prosecutrix. Certainly, these efforts to cause the jury to disbelieve Sutton's testimony cannot be advanced now as a cause for reversal of the unfavorable judgment.

The conversation of the prosecutrix with her mother, as related in the testimony of the mother, after the return to her home of her daughter, was to the effect that the daughter had imparted the information that Sutton had been robbed, and that she had been raped. The Solicitor was very careful in asking the questions necessary to bring out this testimony from the witness. He stated, in the first instance, that he wished counsel for the defendand to be advised of what testimony be sought to develop. He stated, too, that he did not wish the witness to go into the details of the information given her by her daughter. The testimony was clearly competent and relevant. See *State v. Sudduth*, 52 S. C., 488, 30 S. E., 408; *State v. Dawson*, 88 S. C., 225, 70 S. E., 721.

The testimony of Mr. Glaze as to a "conversation with Sutton and Hall about what 'a fellow' had said" related to information Sutton had obtained as

to the defendant having purchased an automobile on Monday following the alleged attack on Saturday night. After that information was received on Monday, the defendant was arrested that night, at the time being in possession of the very automobile the information showed he had purchased on that day. The defendant, when arrested, admitted to the officers he had purchased the car that morning, and, in his testimony in the trial, he acknowledged the purchase of the car. When this testimony was being taken, the Solicitor warned the witness, Mr. Glaze, that he did not wish him to go into any conversations, but only wanted to obtain the fact that he had received information as to the purchase of the automobile, and who had given him the information, and what he did in pursuance of the information obtained. Since the defendant admitted the truth of all the information that Officer Glaze and Sutton had received, we are unable to see how the testimony, even if objectionable, could have prejudiced his defense.

The testimony of A. O. Sutton, referred to in the dissenting opinion was admissible without any doubt.

This witness had testified on direct examination that at the county jail, in the presence of Mr. Smith, Mr. J. D. Sutton, and the defendant, the defendant had stated positively that he did not know J. D. Sutton. On cross examination, the testimony said to be objectionable was brought out. It was to the effect that Mr. J. D. Sutton, at the suggestion of Mr. Smith, identified the defendant, in a crowd of eight prisoners, as being the man who had committed the crimes. Mr. Smith made no statement at the time. He only asked Sutton, in the defendant's presence, if Sutton could "pick your man out."

We may add that the Circuit Judge in the trial of the case had to be unusually careful as to striking out "hearsay evidence," or instructing the jury not to consider such evidence. If such testimony was adduced without objection, and it later developed that some part of it

may have been beneficial to the defendant's cause, then, on proper exception to this Court, it would have been the duty of this Court to reverse the judgment. That point was expressly decided in the case of *State v. Wardlaw*, 170 S. C., 116, 169 S. E., 840, referred to in the dissenting opinion of Mr. Justice Cothran, where this Court granted a new trial to a defendant sentenced to death, because Judge Grimball, who also presided at the trial in this case, charged the jury not to consider certain evidence he regarded incompetent, which had been admitted without objection. The reason of the decision was that incompetent evidence, admitted without objection, under our law, becomes competent, and may be properly considered by the jury.

We cannot help but feel that the criticism directed in the dissenting opinions at the judgment of the Court below is due very much to the abhorrence of the dissenting Justices of the conduct of Sutton particularly, and, in some manner, of the conduct of the prosecutrix. Perhaps, it is true that these witnesses sought to shield themselves, and to excuse their long absence from the home of the mother, by bringing the charge that the girl had been ravished, as it is suggested in the dissenting opinions. There must be grave doubt, however, as to the correctness of that intimation. One will naturally ask some questions. Would not it have been much easier to have trumped up some other excuse for the absence? If the witnesses were guilty of immoral conduct, as it is intimated, would not the bringing of the charge of rape against the defendant, and the trial in a Court of justice, expose them not only to the criticism of the mother, but to the embarrassment of being made ashamed in the eyes of the whole world? Would Sutton, under the circumstances, have laid this false charge against the accused, when he knew that his doing so, in all likelihood, would bring to his wife the knowledge of his conduct? If, as the accused testified, Sutton was involved with him in the thefts of numerous automobiles, would Sutton have run the risk of

the exposure of those thefts by bringing against the defendant a charge so serious? All these matters and questions were properly for the consideration of the jury, not for this Court. We shall not try to defend the conduct of the witnesses. It is not necessary here. However bad they may have been, their wickedness cannot justify the commission of the crime charged to the defendant, if he was guilty. The cowardice of Sutton cannot be used, legally or morally, as a shield in defense of a ravisher.

As already said, this Court is one for the correction of errors of law only. Some of the language of Mr. Justice Marion, in *Chisolm v. Railway Co.,* 121 S. C., 394, 114 S. E., 500, 504, seems singularly applicable: "The issues were for the jury. If, as is sometimes intimated, unjust or mistaken verdicts are occasionally rendered by juries, * * * the remedy does not lie in usurpation by an appellate Court of the prerogatives of the jury, to whose unanimous judgment our law rightly commits the ultimate solution of these oftentimes difficult questions of mixed law and fact."

We must not overlook the fact that the members of this Court are not given the opportunity of seeing the witnesses, hearing their words, and observing their demeanor. These things count much, as they should, in the determination of the credibility of the witnesses, and if their testimony be true or false. The jurors and presiding Judge had those opportunities. At this distance we do not feel that we should criticize the verdict the jury rendered, or the action of the presiding Judge in failing to disturb that verdict, for they, as well as the members of this Court, have solemnly sworn to perform their respective duties, and we cannot say, in the face of the record, that they have failed in that regard.

It is suggested that if other witnesses, especially the interne at the hospital, had been produced in the trial Court, perhaps the verdict of the jury may not have been that which was rendered. This Court, in this appeal, cannot prop-

erly entertain that suggestion as a ground for the reversal of the judgment. The rules of the Court and many decisions, not necessary to be cited, point out the proper manner in which new trials may be granted for after-discovered evidence. The defendant was convicted one year ago. His appeal has been pending in this Court for several months. No application for a new trial, on the ground of after-discovered evidence, has been presented. Certainly, if such evidence existed, the counsel for the defendant here, always diligent and persistent in the defense of his clients, who is so well acquainted with the rules of the Court, and the decisions as to such matters, would have presented the proper application.

Even if it appeared to our entire satisfaction that the glaring falsehoods in the testimony of the defendant were due to his desperate situation, and those falsehoods brought about his conviction, this Court has not the power to reverse the judgment against the defendant because of those falsehoods. That he should be excused and forgiven for those falsehoods is not in this Court, one limited to the correction of errors of law only in cases of this character, a legal ground for the reversal of the judgment. The Supreme Judge of the universe vested the power of forgiveness in the greatest of all jurors, and, in the exercise of that power, that Great Juror forgave Peter for his false denials, after that beloved disciple had wept bitterly. The people of this state, who have given this court all the authority it possesses, have not intrusted to it the power of forgiveness, or the privilege of granting mercy. Mercy to the defendant, under the law, rested, first, with a jury of his country; that jury did not think him entitled to it. The granting of mercy did not even rest with the trial judge. At this stage, the power to extend mercy rests alone with his excellency, the Governor of this state, who, by our Constitution, is directed to "take care that the laws be faithfully executed in mercy." Article 4, § 12.

It appears to us that our duty, while a solemn one, is clear; it is that the judgment of the Court of General Sessions of Lexington County be, and the same is hereby, affirmed.

MESSRS. JUSTICES STABLER and CARTER and MESSRS. T. S. SEASE, H. F. RICE, C. C. FEATHERSTONE, J. HENRY JOHNSON, M. M. MANN, G. B. GREENE, E. C. DENNIS, S. W. G. SHIPP, A. L. GASTON and G. DEWEY OXNER, Circuit Judges, concur.

MR. JUSTICE BONHAM and MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN and MESSRS. C. J. RAMAGE and PHILIP H. STOLL, Circuit Judges, dissent.

MR. JUSTICE BONHAM (dissenting) : I dissent from the main opinion in this case and concur in the dissenting opinion of Mr. Acting Associate Justice Cothran, for the reason that I think it is patent on the face of the reported evidence that the unfortunate defendant is the victim of circumstances in which the two principal witnesses for the prosecution find it necessary, in order to free themselves from the consequences of the situation in which they were discovered, to sacrifice the defendant by the charge that they were the victims of a robber and rapist. I am not willing to believe that any white man, however weak and cowardly he may be, would have acted as the male prosecuting witness in this case swore he did. It is impossible to believe that he could stand by and see the woman who was in his care subjected to the foul embraces of a negro, and moved from place to place for the accomplishment of his purpose, without making an effort to defend her though he died in the attempt.

Sheriff Oswald testified that Sutton told him that the negro tied him. Sutton denied this. Sheriff Oswald could have no motive of hostility toward Sutton, or partisanship for the negro, in making this statement; Sutton had an incentive for denying it.

Sutton and the young woman say the negro kept them at the place of the attack for more than two hours, and moved

them about. Did no chance for resistance present itself during all that time, especially while the rape was being committed? Evidently Sutton was sincere when he said his life was the sweetest thing.

One is compelled, it seems to me, to the conclusion that he is attempting by this horrible story to shield himself from shame and disgrace, and the consequences of some unlawful or immoral act of his own.

One cannot escape the conviction that the utterly false and wild story told by the defendant contributed much to his conviction, and his present unfortunate situation. He lied, patently and foolishly. His life was in danger; he is an ignorant negro; but I submit that his rambling, silly story is no more improbable, nor any harder to believe, than is the blasting, searing tale told by the prosecuting witnesses in this case.

The defendant lied. On the night of his betrayal the Savior said to Peter, "before the cock crows you will deny me three times." And before the cock crew Peter had, with vehemence and oaths, denied his Lord thrice. And yet, he became one of the greatest of the disciples, and the Savior said of him: "On this rock I found my church." In His infinite wisdom He knew that in the weakness of human nature one in the stress of imminent danger will lie.

The rule of the law, in *favorem vitae,* is founded in that mercy which is the boast of the law in the manner of its enforcement. It is made to meet just such an emergency as this. Mr. Acting Justice Cothran has shown that it is recognized and has been followed by the Courts of this State aforetimes to avert a miscarriage of justice; and he has shown that there is here so grave a doubt of the guilt of the accused as to make it an error of law that the jury did not follow the instruction of the Court that the prisoner be given the benefit of every reasonable doubt and acquitted.

I submit that the evidence touching the actual commission of the crime is rendered uncertain by the unreliability and

improbability of the story told by the two prosecuting witnesses. It was easy enough to have proved the fact that a rape had been committed if the charge was true. The woman had been taken, they say, to an hospital in Columbia, a few miles away from the place of trial. The doctor or other person who examined her could have been called to testify to the fact that a rape had been committed, if it was a fact; it was not done. If it be said that the defendant could have produced the evidence to disprove the charge, if the evidence of the person making the examination would so testify, the argument would be unsound. It is the duty of the State to prove such charge and to produce all the available evidence which would prove it beyond a reasonable doubt. The State has all the resources of the law, and the services of learned and able counsel. The defendant is an ignorant, illiterate, and apparently penniless negro; too poor to employ counsel, and who was defended by counsel appointed by the Court. The failure to produce this evidence, if it existed, raises the persumption that it did not exist, and that presumption raises a very reasonable doubt of the guilt of the accused.

The main opinion dwells with eloquence upon the fact that a wave of crime is sweeping the country. Conceded; that does not justify forgetting the principle of law that it is better that ninety-nine guilty men escape than that one innocent man be convicted and put to death. The death at the hands of the law of an innocent man casts more reproach upon the administration of the law than does the failure to convict the guilty.

The law knows this; hence its old and wise rule that the guilt of the accused must be proved beyond a reasonable doubt before an accused can be convicted. When the evidence leaves grave, or if you prefer reasonable, doubt of the guilt of the accused, it is error of law to convict.

My dissent in this case is based upon my conscientious conclusion that the evidence leaves grave doubt of the guilt of the accused, and my apprehension that if this judgment

be affirmed, the affirmance may serve hereafter as a precedent to endanger the lives or liberties of others.

Surely this is a case in which the merciful provision of the principle in *favorem vitae* may be invoked.

Mr. Acting Associate Justice W. C. Cothran and Mr. C. J. Ramage, Circuit Judge, concur.

Mr. Acting Associate Justice W. C. Cothran (dissenting) : I am forced to dissent from the judgment of this Court affirming the judgment of the Circuit Court under which the defendant-appellant was sentenced to death. My whole nature rebels against this judgment to such an extent that I have made a most careful search of the record in an effort to find errors which might warrant a new trial.

The defendant was represented by counsel appointed by the Court and, on the third day after his arraignment, was brought to trial. This was in accordance with the strict practice of the law and no legal objection can be made to this procedure, although it goes without saying that it was impossible for the appointed attorneys to properly study and prepare the defense of the defendant in so short a time. I wish it fully understood that no aspersions are cast upon the attorneys appointed by the Court to represent this negro, although it is well known that such work is very distasteful to attorneys generally and in many cases their work is largely perfunctory. If a reasonable fee could be provided for such work, more interest would be taken in it. One notable exception to this general apathy on the part of attorneys appointed by the Court was found in the conduct of Honorable William P. Greene of Abbeville in his efforts to save the life of the defendant in the case of *State v. Wardlaw*, 170 S. C., 116, 169 S. E., 840, very recently decided by this Court. Twice did he exert his every effort in the Circuit Court, and once in the Supreme Court, on behalf of his client, and his brilliant defense of a penniless negro, although unavailing, is worthy of a permanent record in the law reports of this State.

The attorneys appointed by the Court to defend the appellant herein do not represent him in this appeal; a lawyer of his own race appears in his behalf. His exceptions are meager and bring up mainly the question of the utter unreasonableness of the story of the two main witnesses for the state. The appellant is asking this Court to pass upon the evidence and to say that because of its contradictions, its unreasonableness, its utter improbability, it must be disregarded as unworthy of belief. He must realize that such is not the province of this Court. I may, however, gratuitously add that if I had been the presiding Judge or even a member of the jury the appellant would not now be under sentence of death as the result of that trial.

I cannot see that any benefit would result from the expression of my views involving the conduct of the two principal witnesses for the state on the occasion of the alleged attack. Their perfect obedience to every command of the defendant; their failure to make any outcry or show of resistance; their remaining passive and obedient to his orders when he left them standing in order to go some distance and search the car; the attitude of Sutton as an interested spectator, idly looking on during the rape of his girl companion; the failure to report the alleged rape to the officers of the law until after the arrest of the defendant upon a charge of robbery, thereby considering the alleged loss of $100 of more consequence than the outrage committed upon the girl; the failure to have any doctor or nurse from the hospital give testimony at the trial; the allegation that Sutton stopped his car on a side road away from the highway in order to light a cigarette—all of these facts and many others, taken in connection with many contradictions in the testimony of the two principal witnesses, have placed such a strain upon my credulity that the breaking point was nearly reached. The "last straw," the one which broke it completely, was the testimony of Sheriff Oswald that Sutton told him that his hands were tied be-

hind his back and that he was thereby fastened to a stob driven in the ground during the alleged attack, all of which was absolutely denied by both principal witnesses.

Interested parties may by this time begin to wonder upon what my dissent is based, and the real reason for this dissent will now be stated.

In the case of *State v. Griffin,* 129 S. C., 200, 124 S. E., 81, 35 A. L. R., 1227, the defendant was convicted of attempting to administer poison. During the trial there was not one objection raised to the admission of the evidence although incompetent evidence was offered. The Court reversed the judgment in that case citing the following from *State v. McNinch,* 12 S. C., 89: "This Court is bound, in a capital case (and we think equally so in a case of felony involving the deprivation of the defendant's liberty), to take notice, in behalf of the accused, of any error apparent upon the record by which the prisoner has been deprived of any of the substantial means of enjoying a fair and impartial trial."

Based upon that most humane doctrine, I will now set forth such incompetent testimony as I find in the record. Some of this testimony, while incompetent, could hardly be said to be prejudicial; some of it was sworn to by other witnesses whose testimony was competent; some of it was cumulative and, hence, not sufficient for a reversal, but, taken as a whole, there was enough, in my opinion, to be not only material but prejudicial.

The folio numbers set forth below are given for the benefit of those sufficiently interested in this appeal to refer to the transcript.

The testimony below set forth related to conversations had in the absence of the defendant, and this fact should be borne in mind as proof of its incompetency.

The following is taken from the testimony of Sutton:

a. Narrating conversation with one Dickson prior to the alleged attack. Folio 16.

b. Stating what a boy told him. Folio 59.

c. Stating what the officers asked about a stick pin. Folio 70.

d. Stating what the officers said upon finding the stick pin. Folio 73.

e. Stating what the officers said about hoping to catch the defendant. Folio 85.

f. Stating conversation with some one at his employer's store. Folio 112.

g. Stating what favors the family of the girl would ask of him. Folio 146.

h. Stating conversation with the solicitor. Folio 182.

i. Stating conversation with the girl. Folio 247.

j. Stating conversation with "Mac" and what "Mac" said. Folio 276.

Testimony of A. W. Dickson: Stating conversation with Sutton prior to difficulty. Folio 290.

Testimony of mother of the girl: Conversation with daughter after she returned home after attack, the solicitor himself intimating that said testimony was incompetent. Folios 307, 308.

Testimony of A. M. Glaze:

Conversation with Sutton and Hall about what "a fellow" had, said. Folio 319.

Stating what Sutton said in searching room of defendand. Folios 335, 336.

Testimony of Tom Corley: Stating how Sutton described his stick pin. Folio 371.

Testimony of the Girl: Stating what Sutton told her when they first left her home. Folio 379.

Testimony of A. O. Sutton: Stating what Mr. Smith said at the jail to Sutton about the identity of the defendant. Folio 727.

All of the testimony set forth above is, in my opinion, incompetent and, taken as a whole, tended to have a most

prejudicial effect upon the defendant in the minds of the jury.

I need not be reminded that this opinion may be considered somewhat technical in its holding, but, being so thoroughly convinced that a grave injustice has been done the defendant, I seek that haven of refuge in his behalf which has been furnished us for generations from the English law and give as my reason for this dissent: In *favorem vitae et libertatis*.

MR. JUSTICE BONHAM, and MR. C. J. RAMAGE, Circuit Judge, concur.